# BESSER COMPANY

## V.

# RAYMOND F. HANSEN

Record No. 910572

February 28, 1992

Present: All the Justices

*Allan S. Reynolds (S. Lawrence Dumville; Reynolds, Smith & Winters; Breeden, MacMillan & Green*, on briefs), for appellant.
*Edward F. Halloran (Robert S. Brewbaker, Jr.; Rilee, Cantor & Russell*, on brief), for appellee.

JUSTICE WHITING delivered the opinion of the Court.

This product liability case involves issues of a manufacturer's tort and implied warranty liability arising out of a third party's alleged misuse of the manufacturer's product.

On March 12, 1987, Raymond F. Hansen, an employee at a concrete block manufacturing plant of Tarmac-Lone Star Company (Tarmac) in Chesapeake, was injured in his operation of a "transfer car" manufactured by the Besser Company (Besser). Hansen sued Besser and recovered a judgment upon a jury's verdict for one million dollars. Besser appeals.

We state the evidence and the reasonable inferences that can be drawn therefrom in the light most favorable to Hansen, the party who prevailed at trial. *Oden v. Salch*, 237 Va. 525, 527, 379 S.E.2d 346, 348 (1989); *Virginia & Md. R.R. v. White*, 228 Va. 140, 142, 319 S.E.2d 755, 756 (1984).

### Tarmac's Manufacturing Process

After Tarmac's cement blocks were formed, they were loaded on racks that held eight tons of the "green" blocks. The racks, equipped with flanged steel wheels, moved on railroad tracks.

Automatic coupling devices, supplied and maintained by Tarmac, were located in the center of the lower edges of the front and back of each rack. When the fronts and backs of the racks were pushed together, the racks were designed to couple automatically when a hook on the rear rack rolled over a bumper bar on the front rack and dropped down after clearing the bar.

Each loaded rack was hauled to one of four long, narrow rooms called "preset" rooms. When 10 loaded racks accumulated in the preset rooms, the coupled racks were pulled forward from the preset rooms along railroad tracks installed on the flat top of Besser's transfer car into one of the four "autoclaves" opposite each preset room.

The autoclave was a cylindrical, high-pressure, steel chamber 10 feet in diameter and 110 feet long with tracks in the bottom. The green blocks were then rapidly cured in the autoclaves under intense heat and pressure.

*Besser's Transfer Car*

Besser's electrically powered transfer car (the car) replaced a previous transfer car that had worn out. The front of Besser's car was considered as that part facing the autoclaves, and the rear was that part adjacent to the preset rooms. The sides of the car were considered right or left as they would appear to an operator standing at the rear of the car facing forward.

The car pulled the racks along its surface by means of a "shuttle" or ram installed between its railroad tracks. This shuttle was a steel platform connected to a large, screw-type, electrically driven shaft or extended worm gear.

The rotation of this worm gear clockwise or counterclockwise caused the shuttle to go forward or backward between the front and back ends of the car. At each end of the shuttle was a "ratchet-like" device called a "dog" that, when raised by a cam, successively engaged a series of hooks in the center of the bottom of each rack. When a dog and a rack hook were engaged, the rack was pulled forward or backward in the desired direction across the car's surface as the electrically driven worm gear rotated.

The pulling tension kept the dog and hook engaged until the shuttle reached the limit of its movement. At that point, the worm gear stopped rotating, released the pulling tension, and the dog dropped from the hook in the bottom of the rack. Because there were no dogs engaged in one of the hooks on the bottom of the rack, the rack movement was temporarily interrupted while the worm gear reversed.

Upon the return of the worm gear and shuttle to their original position, the worm gear resumed its original direction of rotation, re-engaged a dog and the next hook in the bottom of the rack, and pulled the rack through the next cycle in its desired direction of travel. The rack moved two miles an hour on successive cycles as it crossed the car's surface. It took several cycles for each rack to cross the surface of the car.

A control box four feet tall, 10 inches wide, and six feet long, was mounted with its length running along the right side of the car. This control box was located near the rear of the car, leaving just enough room for an operator to stand behind the box and control all shuttle movements by utilizing switches on a panel.

The panel was located on the rear of the control box facing away from the front of the autoclave. Thus, the panel was posi-

tioned at a 90-degree angle to the side of the transfer car and could not be seen by anyone who stood at the front of the car.

The operator activated the forward and backward movement of the shuttle by pulling out a button on the panel. If he desired to stop the shuttle movement, the operator merely depressed the "mushroom" button or stop switch. Besser provided, but Tarmac did not use, a "lock-out" key which, if turned and removed, prevented anyone but the operator from pulling out the mushroom button to resume operation.

Once the operator put the shuttle in operation, he controlled it manually by turning a three-way switch to the left from its "off" position in the center to a "hand" position. Then, he pushed a "joy stick" on the panel in the desired direction of movement of the racks across the tracks. The joy stick returned to a "neutral" or "off" position whenever the operator released it.

When the operator desired to have the shuttle move the racks automatically, he turned the three-way switch to the right from its "off" position to a position marked "auto." Upon doing so, a red light located to the immediate right of the three-way switch was automatically activated to warn the operator that the shuttle was in its automatic mode. This warning was necessary because the shuttle continued to move the racks as it went through its cycles in the automatic mode.

The operator stopped the shuttle from moving the racks while in its automatic mode by turning the three-way switch to the left from the "auto" position to the "off" position. He could also stop the shuttle's automatic pulling movement by pressing an emergency mushroom or stop switch located just to the left of the three-way switch.

The car itself traveled between the preset rooms and autoclaves and out into the block storage areas on railroad tracks that were installed in a long two-foot deep pit, approximately 13 feet wide, that ran at a 90-degree angle to the track on the car's platform. At each end of the pit were intersecting tracks on the same level as that of the car's top.

### Potentials for Derailment

Besser minimized the risk of the rack wheels running off the rails as they passed over the gap between the aligned car rails and the preset room rails by constructing the car so that the ends of the rails almost touched. However, a similar minimal space could

not be provided between the car rails and those of the autoclaves. This was because the autoclaves' steel doors, when closed, would lack sufficient clearance to properly seal the autoclaves if their rail ends were flush with the fronts of the autoclaves.

To bridge the required clearance gap of almost three feet, Tarmac provided and maintained a collapsible "bridge," consisting of rails, hinged on the ends of the autoclave rails and braced by supporting steel "legs," when in position, to carry the racks across the gap. Nevertheless, because of Tarmac's poor maintenance, there were frequent derailings at or near the bridge as racks were being loaded or unloaded from the autoclaves.

To minimize the effect of such derailings, the car operator put the shuttle in the automatic mode and left the operator's position in front of the panel. The operator then stood on the floor of the pit near the right front side of the transfer car to watch the rack wheels as they approached and crossed the bridge. If the operator observed a wheel run off the track, he immediately went to the rear of the control box, reached up, and turned the three-way switch from "auto" to "off."

### Uncoupling the Racks

After the cement blocks were cured in the autoclave, the operator, using the car's manual control, pulled one coupled rack out of the autoclave for a sufficient distance to permit the rack to be uncoupled from the rack in front of it. The car then carried the uncoupled rack from the front of the autoclave to the intersecting tracks at the ends of the pit. There, the cured blocks were offloaded and taken to storage areas.

The automatic uncoupling device on the replaced transfer car no longer worked. Accordingly, the car operator had to step between the transfer car and the rack to uncouple them. Because the hook of one rack was latched over the bar coupling on the next rack, after manually lifting the hook, the car operator placed broken pieces of concrete block under the hook to keep it from falling back and recoupling the racks. After doing so, he remounted the car and, using its manual control, backed the uncoupled rack from its preceding rack.

Besser agreed to design and build an automatic uncoupling device on its replacement car that could be used with Tarmac's properly maintained racks and tracks. The device was a block of steel welded on the shuttle with an appropriate cam that would

contact the cam on the bottom of the rack hook. The cam on the block of steel was designed to contact a cam on the bottom of the rack hook each time the shuttle went underneath the coupling between the racks and to lift the rack hook from the bumper bar on the next rack. The steel bar on the shuttle was designed to keep the rack hook up until the shuttle movement separated the racks.

Tarmac installed Besser's car and made all the modifications of its system to accommodate the car. Besser's representatives were present to provide assistance when the car was installed.

Before one of Besser's representatives left Tarmac's plant, the car's automatic uncoupler functioned properly as he watched it unload racks from some of the autoclaves. A short time later, Tarmac's employees found that the uncoupler would not work all the time because Besser's camming bar was too high and it jammed against the cam on the rack instead of pushing it up. Tarmac's employees trimmed the bar but it "still didn't work."

### Hansen's Accident

Toward the end of his eight-hour shift, Hansen, with the car in the automatic mode, watched the rack wheels cross the bridge and enter the autoclave. When he noticed that the wheels of one of the racks had derailed some distance inside the autoclave, Hansen went from his position in the pit toward the rear of the transfer car and turned the three-way switch from "auto" to "off."

Returning to the derailed rack, Hansen reached between the derailed rack inside the autoclave and the rack following it on the car platform and uncoupled them, leaving a concrete block under the hook to prevent it from recoupling. Using the car's manual controls, Hansen backed the uncoupled racks from the autoclave a sufficient distance to enable him to get a house jack under the derailed rack and reposition its wheels on the tracks inside the autoclave.

After getting the derailed wheels back on the track, Hansen asked Norman Kindley, his foreman, to go back into the preset rooms to see if those racks were still coupled. Hansen turned the three-way switch to "auto" to bring the racks forward from the preset room to be recoupled with those in the autoclave. Again, Hansen stood on the floor of the pit near the bridge to watch the rack wheels as they approached and crossed the bridge. As soon as the front of the rear rack "bumped" the rear of the rack in the autoclave, Hansen went back to the control panel "to cut [the

three-way switch] to off so [he] could relatch the other five racks going into the autoclave."

Hansen testified that he "was standing right here by the panel. [He] come around the back of the panel right here, come around like that, reached in, and cut the switch to off (indicating)."

Hansen did not look at the control panel when he turned the switch to "off" because he "was looking down trying to watch the wheels so it would not derail coming across the transfer car," and he had "done that thousands and thousands of times and pushed the switch, turn[ed] the switch, the three-way switch." Because he "believed" and "[i]t felt like" the three-way switch was in the "off" position, Hansen returned to the racks to recouple them. However, Kindley testified that, except for pausing or stopping for short periods of time, the racks were moving until Hansen's accident.

In order to uncouple the racks, Hansen stepped between them to remove the piece of concrete block he had used to prop up the hook. At that point, he heard a "click" from the control box, and the rear racks started moving toward him. The car pulled the racks forward at least two shuttle cycles and pinned Hansen between the rack moving forward across the transfer car and the front of the autoclave.

When Hansen "hollered," Kindley came up from the preset room, pushed the mushroom button and stopped the racks. Kindley then turned the three-way switch from "auto" to "manual," backed the racks "approximately two full [cycles]," and removed Hansen from the autoclave. Hansen suffered a number of serious injuries as a result of being pushed against the autoclave.

At trial, the jury considered: (1) whether Besser breached its implied warranty of fitness for Tarmac's purposes; (2) whether Besser was negligent in its design and manufacture of a product that was not reasonably safe for its "intended purpose or any other reasonably foreseeable purpose"; (3) whether Hansen misused Besser's product or used it in a way that was not reasonably foreseeable by Besser, and thus was barred from recovery on the breach of warranty claim; and (4) whether Hansen was guilty of contributory negligence which barred his recovery on his negligence claim. The court refused to submit the issue of whether Hansen assumed the risk of injury and thus could not recover on his claim of negligence.

■ At the outset, we are met with a contention by Hansen that Michigan law controls our decision. According to him, the law of Michigan, where the contract was made and where the product was manufactured, determines the substantive rights of the parties. We do not agree.

As pertinent, the Uniform Commercial Code provides that

> when a transaction bears a reasonable relation to this Commonwealth and also to another state or nation the parties may agree that the law either of this Commonwealth or of such other state or nation shall govern their rights and duties. Failing such agreement this act applies to transactions bearing an appropriate relation to this Commonwealth.

Code § 8.1-105(1).

Besser and Tarmac did not agree upon the law to be applied. The fact that Besser built the car for use in Virginia, that it supervised its installation, and that Hansen was injured in Virginia, gives the transaction "an appropriate relation" to Virginia. Accordingly, we hold that Virginia law applies.

Although Besser may have foreseen that an operator would be forced to step between the racks if its automatic coupler was defective, the defective uncoupler did not cause the accident. It occurred because the car moved the racks forward and one rack crushed Hansen against the autoclave. Such a movement could only have resulted because of some defect in the car or because Hansen did not switch the shuttle out of its automatic mode.

■ At trial, Hansen relied upon one of Besser's expert witnesses' testimony that "power spikes" or "voltage surges" can override one of the car's switches while in its "off" position. The expert described the predicate for such a condition as a fault or malfunction in the car. Because there was no evidence of any of these conditions at the time of Hansen's accident, the evidence was insufficient to support a finding on this premise.

Hansen also claimed that the three-way switch frequently became loose, and was loose when he turned it to "off" just before his accident. The evidence indicated that when loose, the switch could be turned to a fourth position. This contention is meritless, however, because the evidence also showed that the fourth position was simply another "off" position.

■ Next, we consider the three-way switch. Unlike the defective car gear shift indicator in *Ford Motor Co.* v. *Bartholomew*, 224 Va. 421, 432-33, 297 S.E.2d 675, 681 (1982), no defect in Besser's switch caused the shuttle to start moving the racks forward. And, unlike the case against one of the defendants in *Featherall* v. *Firestone*, 219 Va. 949, 966, 252 S.E.2d 358, 369 (1979), where there was a failure to warn against the use of a pressure regulator without an easily removable locknut, Besser's three-way switch had all the necessary components and warnings for a safe operation when used as directed on the instrument panel.

Hansen contends that "[h]e used the switches on the machine in the same fashion that he had done hundreds of times before and as all other operators did." If he had done that, the car would not have been dangerous; nothing in the record indicates that the car had ever moved the racks when the switch was in the "off" position. Instead, the probative evidence indicates. that Hansen failed to turn the switch from "auto" to "off," and failed to look at the warning light to verify that he had done so.

Hansen's primary contention was that the design of the car made it unsafe and, therefore, defective. According to one of Hansen's experts, Besser should have reasonably foreseen that an operator, tired after working a full shift and in a hurry to finish before the shift ended, might inadvertently fail to turn the switch from "auto" to "off" before stepping between the racks to couple or uncouple them. And, to protect the operator against this inadvertence, Hansen's experts opined that Besser should have provided (1) lights visible to Hansen as he stepped between the racks to warn him that the car was still in its automatic mode, and (2) emergency stop buttons or switches that were accessible to Hansen as he stood between the racks.

■ "[A] manufacturer is not required to supply an accident-proof product." *Featherall*, 219 Va. at 963, 252 S.E.2d at 367 (citing *Turner* v. *Manning, Maxwell & Moore, Inc.*, 216 Va. 245, 251, 217 S.E.2d 863, 868 (1975)). Besser's obligation to supply such warning lights and emergency stop switches depends on whether it

(a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and

(b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and

(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

*Featherall*, 219 Va. at 962, 252 S.E.2d at 366 (quoting Restatement (Second) of Torts § 388 (1965)).

The car would become dangerous only if its operator placed himself in the path of the racks while he had the three-way switch in the automatic mode. Besser had no reason to know or foresee that an operator would put himself in the path of the racks without seeing that he had the switch turned to "off."

Nor did Besser have reason to know or foresee that an operator would not realize that danger and heed the warnings on the panel. As James Cope, the Tarmac employee who instructed Hansen in the operation of the car, put it, "[c]ommon sense would tell you if you're going in between the [racks] always shut the car off."

Besser's warning light gave ample warning to an operator that he had left the shuttle in "automatic." In the exercise of its duty of reasonable care, Besser was not required to foresee that an operator would ignore Besser's warning light and place himself in a dangerous position between the rack and the autoclave. Hence, Besser had no duty to provide additional warning lights and "off" switches that Hansen could see and activate as he was coupling or uncoupling the racks. Accordingly, we conclude that the evidence is insufficient, as a matter of law, to establish Besser's primary negligence.

We turn now to Hansen's claim for breach of implied warranties. This claim is premised upon the same theories of dangerous design and failure to warn as Hansen's negligence claim. Hansen had the burden of showing

"(1) that the goods were unreasonably dangerous either for the use to which they would ordinarily be put or for some other reasonably foreseeable purpose, and (2) that the unreasonably dangerous condition existed when the goods left the defendant's hands." *Logan v. Montgomery Ward & Co.*, 216 Va. 425, 428, 219 S.E.2d 685, 687 (1975). And there can be no recovery against the manufacturer for breach of these im-

plied warranties when there has been an unforeseen misuse of the article supplied.

*Featherall*, 219 Va. at 963-64, 252 S.E.2d at 367.

■ Tested by these principles, Hansen's claims for breaches of implied warranties must fail. The car was not unreasonably dangerous when the operator manually coupled the racks because the three-way switch provided ample protection if the switch was turned to its "off" position. It was Hansen's unforeseeable misuse of the switch and warning light that caused the accident.

For these reasons, we conclude that the evidence is insufficient to impose liability upon Besser for Hansen's injuries.* Accordingly, we will reverse the judgment of the trial court and enter final judgment for Besser.

*Reversed and final judgment.*

---

* In view of this holding, we need not decide any of the other issues raised in this appeal.