Shelley Jo **BUETTNER**, Plaintiff,

v.

**SUPER LAUNDRY MACHINERY,**
**Defendant.**

No. 2:93cv454.

United States District Court,
E.D. Virginia,
Norfolk Division.

Feb. 8, 1994.

Mark R. Skolrood, Payne, Gates, Farthing & Radd, P.C., Norfolk, VA, for Shelley Jo Buettner.

S. Lawrence Dumville, Breeden, MacMillan & Green P.L.C., Norfolk, VA, for Lawrence Leroy McClain.

Bradford .F. Stillman, McGuire, Woods, Battle & Boothe, Norfolk, VA, for Tingue Brown & Co.

Alan B. Raskind, Furniss, Davis, Rashkind & Saunders, Norfolk, VA, for R.W. Martin & Sons.

## MEMORANDUM OPINION

JACKSON, District Judge.

In this action, plaintiff Shelley Jo Buettner seeks damages for personal injuries suffered while employed at Shared Hospital Services ("SHS"), a commercial laundry in Portsmouth, Virginia. The action comes before the court at this time on motions for summary judgement by defendants R.W. Martin & Sons, Inc. ("Martin") and Lawrence Leroy McClain ("McClain"). For the reasons discussed below, defendants' motion will be GRANTED.

### Statement of Facts

On the morning of October 31, 1990, in preparation for the day's work, plaintiff, a supervisor of the flatwork department at SHS, had just turned on the fifth of five ironers. As she began to walk around it to lower the heated pressure rolls on the other side, however, her sweater became entangled in the feed drive unit at the front of the ironer, which resulted in the traumatic amputation of her right arm below the elbow. At the time, plaintiff had been employed as a supervisor at SHS for approximately four years. Before that she had spent about ten years as a worker in the flatwork department. As supervisor, Buettner was responsible for training and observing safety functions.

SHS bought the ironer that injured Buettner from defendant R.W. Martin & Sons, Inc., an Ohio corporation in the business of selling new and used laundry equipment. In 1986, the President of SHS, Dale James Paradee ("Paradee"), contacted Lawrence Leroy McClain, an Illinois resident in business as a laundry equipment mechanic, requesting his assistance in locating a used ironer for purchase by SHS. At the time, McClain had approximately thirty years of experience in reviewing the safety and performance of laundry equipment for a laundry company. He also taught seminars which focused on the safety and performance of flatwork ironers. After his retirement from the laundry company, he ran his own business installing, repairing and evaluating flatwork ironers for approximately fifteen years.

McClain found an ironer offered for sale by Martin which was located in a laundry in Cleveland, Ohio. McClain inspected the ironer, and on his recommendation, SHS purchased it in December of 1986. The terms of the sale were "as is, where is." Plaintiff was not a party to the contract of sale, was not involved in the purchase and was not even aware of the transaction until the ironer arrived at SHS.

After the sale, the ironer was disassembled by employees of Martin in the presence of McClain, who inventoried the parts and provided assistance as requested. The ironer was shipped to SHS in April of 1987 and unloaded by SHS employees. McClain then reassembled and set up the ironer, with help from SHS employees, between April 1987 and January 1988. SHS did not request that McClain make any changes or additions to the ironer either at the time of sale or at the time of installation and he did not do so. At the time of the manufacture of the ironer no guard had been installed in the vicinity of the feed drive roll.

Paradee had extensive experience in the laundry business. He spent eleven years

with the same company that employed McClain, and for a substantial amount of that time he worked on and maintained flatwork ironers with McClain. He then worked for several other laundry companies before becoming president of SHS in 1975. In total, he had over thirty years of experience in the laundry business. The Plant Manager at SHS, David George, also had extensive experience with flatwork ironers. He had been superintendent of an army laundry for seven years and had also sold laundry supplies and equipment, including flatwork ironers, for approximately twelve years before coming to work at SHS in 1979.

Paradee and James Warren, SHS's maintenance supervisor, had both examined and purchased laundry equipment for SHS in the past. Both supervised the installation of the ironer that injured the plaintiff. SHS employees had purchased and installed at least three of the four other ironers in the shop.

## Standard of Review

Rule 56(c) provides that a moving party is entitled to summary judgment "if the pleading, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party moving for summary judgment is initially responsible for identifying those portions of the factual record which it believes establish that there are no genuine issues of material fact. Once the moving party has made this showing, the opposing party must demonstrate, by reference to affidavits, depositions, answers to interrogatories, or admissions, that a triable issue of fact exists. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). In deciding a motion for summary judgment, the Court is required to view the facts and draw reasonable inferences in a light most favorable to the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Should the non-moving party present a genuine issue of fact that could lead to

a reasonable jury finding, the motion for summary judgment must be denied. *Id.*

## Analysis of Law

In order to succeed on a failure to warn or defective design claim under either a breach of implied warranty or negligence theory, plaintiff must meet the same burden. She must demonstrate that "the goods were unreasonably dangerous either for the use to which they would ordinarily be put or for some other reasonably foreseeable purpose, and that the unreasonably dangerous condition existed when the goods left the defendant's hands." *Harris–Teeter, Inc. v. Burroughs*, 241 Va. 1, 4, 399 S.E.2d 801 (1991). A product is "unreasonably dangerous" if it is "(1) defective in assembly or manufacture; (2) imprudently designed; or (3) not accompanied by adequate warnings about [its] hazardous properties." *Austin v. Clark Equip. Co.*, 821 F.Supp. 1130, 1133 (W.D.Va.1993). Since, as plaintiff asserts, neither defendant contested whether the ironer was unreasonably dangerous for the purposes of this motion, this Court will consider it so in deciding whether to grant summary judgement.

## I. Implied Warranty of Merchantability

■ Plaintiff raises a claim of breach of implied warranty of merchantability against Martin. Defendant Martin alleges that there is no implied warranty to Buettner that could have been breached since the "as is" clause excluded all implied warranties under § 8.2–316. The question on this issue, therefore, is whether under Virginia law, there is an implied warranty of merchantability that runs to Buettner, despite the fact that Martin expressly disclaimed all implied warranties vis-a-vis SHS.

Plaintiff claims that in adopting § 8.2–318 the Virginia legislature intended to create a warranty claim for remote users in their own right, not as defendant suggests to extend the warranty to remote users as third party beneficiaries of the original holder of the implied warranty. If plaintiff's interpretation is persuasive, then defendant Martin cannot disclaim the warranty without having dealt directly with the remote user. If Martin is correct, however, then it would seem

that plaintiff's warranty rights can extend no further than those of SHS, and in this case there are no such rights.

Plaintiff bases her interpretation on the text of the statute, which reads:

**When lack of privity no defense in action against manufacturer or seller of goods.**—Lack of privity between plaintiff and defendant shall be no defense in any action brought against the manufacturer or seller of goods to recover damages for breach of warranty, express or implied, or for negligence, although the plaintiff did not purchase the goods from the defendant, if the plaintiff was a person whom the manufacturer or seller might reasonably have expected to use, consume or be affected by the goods....

Plaintiff notes that Virginia adopted this provision instead of U.C.C. provision 2–318 which simply extends warranties to certain third-party beneficiaries.

**Third Party beneficiaries of Warranties Express or Implied.** A seller's warranty whether express or implied extends to any natural person who is in the family or household of his buyer or who is a guest in his home if it is reasonable to expect that such person may use, consume, or be affected by the goods and who is injured in person by breach of the warranty. A seller may not exclude or limit the operation of this section.

Plaintiff contends that the Virginia legislature was specifically attempting to create an independent warranty for remote users, not simply to create a broader class of third party beneficiaries than the U.C.C. version did. For this reason, the statute says "lack of privity shall be no defense" instead of speaking in terms of who is a third-party beneficiary.

Plaintiff cites language from *Brockett v. Harrell Bros., Inc.*, 206 Va. 457, 461, 143 S.E.2d 897, 901 (1965) in support of her view. There the Virginia Supreme Court stated that "the obvious purpose and effect of this statute ... is to insure the implied warranty of fitness by the manufacturer to the consumer, despite the lack of privity between the two." *Id.* The Court noted that due to this law, it was not necessary to determine whether there was an implied warranty directly to the consumer under common law principles. *Id.* The Court, however, was not addressing the situation we have here where the seller was expressly attempting to avoid all implied warranties [1], and there was no question that the manufacturer impliedly warranted the goods to the buyer. *Id.*

At least one academic, writing just after the statute was enacted, did agree with the plaintiff's view of the law. He stated that the provision "does not depend upon a third-party beneficiary theory and, presumably ... the seller must deal directly with the remote consumer or user before any disclaimer will be effective against him." Speidel, *The Virginia Anti–Privity Statute: Strict Products Liability Under the Uniform Commercial Code*, 51 Va.L.Rev. 804, 836 n. 84 (1965).

Unfortunately for plaintiff, however, she can point to and this Court can find no subsequent case which cites *Brockett* for or independently establishes the proposition that a seller must deal directly with a remote consumer in order to disclaim any implied warranty. Martin, however, does cite one case which strongly suggests that its view represents the governing law.

Defendant cites *Goodbar v. Whitehead Bros.*, in which the Western District of Virginia struck the plaintiffs' implied warranty claim because it said that there was no implied warranty to the buyer since no such warranty arises when the buyer is a sophisticate who knew or should have known of the danger inherent in the product. 591 F.Supp. 552 at 567, *aff'd sub nom. Beale v. Hardy*, 769 F.2d 213 (4th Cir.1985) (adopting the district court's opinion as its own). If no warranty runs to the buyer, no warranty can run to the buyer's employees. "This warranty arises, if at all, at the time the product is sold to the purchaser. It runs from the seller to the purchaser and then from the purchaser to the ultimate user. With one

---

1. In fact, since *Brockett* dealt with an implied warranty for fitness which is imposed by common law on manufacturers of food, there is considerable doubt whether the manufacturer in that case could have disclaimed the warranty in any way. *Id.*

notable exception, the user can rise no higher than purchaser through which he obtained the implied warranty.[2]" *Id.* Given this, the court threw out the plaintiff's claim, since it found that, as in the instant case, there was no warranty to the purchaser. This case seems to be virtually on point; however, the court did not discuss the theory raised by the instant plaintiff that a warranty independent of the purchaser's warranty runs to the user by virtue of § 8.2–318. In fact, the opinion states that "plaintiffs claim derivatively through the [employer] on their implied warranty claim." *Id.*

Therefore, to find for the plaintiff, this Court would have to find that *Goodbar* is inapplicable to the instant case because the plaintiff's claim is for an independent, not derivative warranty. The Court is unwilling to so find. As noted above, plaintiff has cited no case law for the proposition that seller's express disclaimer of warranty is not effective against third party users. Absent an express statement to that effect from the Virginia Courts [3], this Court will not unilaterally establish the principle that sellers' disclaimers of implied warranties do not run to third parties.

Plaintiff attempts to distinguish *Goodbar* on the basis that the case did not involve a disclaimer of warranties but rather "whether an implied warranty extends to a defect that was obvious to the purchaser and thus to the purchaser's employees [since] the knowledge of an industrial purchaser is imputed to its employees." Plaintiff's Memorandum in Opposition to Martin's Motion for Summary Judgement, p. 11–12. Plaintiff interprets *Goodbar* to impute knowledge to the employees of a sophisticated buyer for purposes of implied warranty and implies that this imputed knowledge destroyed the employee's warranty. Plaintiff concludes by claiming that, there is no evidence here as there was in *Goodbar* that the employer knew of the dangers. Unfortunately, this view is based on an erroneous reading of *Goodbar.*

*Goodbar* imputed knowledge to employees for the purposes of negligent failure to warn claims against a seller when the employer was a sophisticated buyer. But the Court did not extinguish an implied warranty to plaintiff on the basis of that imputed knowledge because it found that there could be no warranty between the seller and the employee since there was no warranty between the seller and the buyer. Since there is no question that there was no warranty between Martin and SHS, plaintiff's claim must fail.

■ Plaintiff argues in the alternative that to enforce Martin's disclaimer of warranty against her would be unconscionable. In the Fourth Circuit,

> the factors determining "unconscionability" are various: the nature of the injuries suffered by the plaintiff; whether the plaintiff is a substantial business concern; the relative disparity in the parties' bargaining power; the parties' relative sophistication; whether there is an element of surprise in the inclusion of the challenged clause; and the conspicuousness of the clause ... all of which constitute relevant evidence of whether their transaction was indeed tainted by an absence of meaningful choice. *Carlson v. General Motors Corp.,* 883 F.2d 287, 293, 295 (4th Cir. 1989).

Since the plaintiff is basing her warranty claim upon a contract to which she was not a party, an argument could be made that she therefore had no bargaining power and any limitation of warranty to the buyer would be unconscionable with respect to her. However, to hold that any exclusion of implied warranty is per se unconscionable with respect to third parties because they by definition were not party to the contract would be to create **de facto** via unconscionability doctrine the same independent warranty to third parties that this Court has held above is not

---

2. The exception is that "limitations of damages in personal injury cases is prima facie unconscionable." Plaintiff claims that even if there is no warranty which runs to her, the disclaimer of warranty is unconscionable with respect to her. This claim is evaluated below.

3. *Brockett* simply extended extant warranties to third-party users; it did not address the issue of whether the seller could expressly disclaim those warranties to third-parties by disclaiming them to the buyer.

created by § 8.2–318. The Court is not prepared to do that.

Rather, the Court feels that it is appropriate to analyze the circumstances of this particular case and see if the contract between Martin and SHS was unconscionable with respect to Buettner[4]. As the Court analyzes the factors to determine whether the contract was unconscionable, it is undisputed that plaintiff's injuries were serious and that plaintiff worked for a laundry business which used five of these flatwork ironers. Further, the Court finds, for reasons discussed below, that the parties to the contract were sophisticated with respect to the use of the flatwork ironer. But more to the point, the plaintiff was not an unsophisticated person.

Plaintiff was a supervisor for the flatwork ironer department. She oversaw the use of five such machines and was at least partially responsible for their safe operation. It would therefore strain the credulity of this court to believe that she would have no voice in decisions concerning safety in the department if she opted to speak out. Additionally, as supervisor she bore some responsibility not only for her own safety, but also for the safety of the employees working in her department. Her sophistication with respect to the safe operation of flatwork ironers was not insignificant.

Finally, in the laundry business it was common practice to purchase used equipment. Therefore, a clause in the contract providing no warranty on the used flatwork ironer should have surprised neither SHS, McClain, nor plaintiff. Given these factors, the Court cannot say that the contract was unconscionable with respect to Buettner. Perhaps the outcome would be different if the plaintiff were an untrained, entry-level employee, but that is not the case at bar.

## II. Negligence

■ In addition to proving that the product was unreasonably dangerous when it left the seller's hands, the plaintiff in a products liability negligence action also must demonstrate that the defect was the result of the seller's failure to exercise due care. *Chestnut v. Ford Motor Company,* 445 F.2d 967, 969 (4th Cir.1971). Plaintiff's allegations of negligence against McClain are that he failed to install a guard over the feed ribbon drive roll, failed to install a nip-point guard and failed to warn of the hazard of an in running nip-point at the front of the feed drive roll which McClain knew or should have known constituted an unreasonably dangerous condition. Plaintiff makes a parallel claim of breach of a duty to warn against Martin, but does not pursue a duty to retrofit claim against that defendant.

### A. Duty to Retrofit

■ Plaintiff's allegation that McClain failed to exercise due care in not retrofitting the ironer to accord with the state of the art in safety technology has no basis in law, since there is no Virginia authority which establishes that such a duty is incumbent upon the installer of industrial equipment. In lieu of applicable case law, plaintiff points to the American National Standards Institute's Safety Standards for Conveyors 5.9.1.1, 5.9.1.2 and 5.9.3 and to § 1910.212 of the OSHA regulations, 29 CFR Ch. XVII (7–1–93 Edition), which state that guards should be placed over in-running nip points. Plaintiff asserts that the existence of these standards obligated McClain to retrofit the ironer to conform to the standards in order to meet his duty of due care.

The Court disagrees. The Fourth Circuit has stated that "we do not think, however, that it can be held to be negligence to sell an old model machine not equipped with a safety device of later models …" *Pontifex v. Sears, Roebuck & Co.,* 226 F.2d 909, 910 (4th Cir.1955). In this case, plaintiff has not even provided any evidence that any manufacturer equipped this type of ironer with the sort of guards plaintiff says McClain should have installed either at the time of installation or

4. The Court feels that the record, which contains depositions and answers to interrogatories, as a whole is plainly adequate for a careful examination of the circumstances surrounding the transaction. *Carlson,* 883 F.2d at 293. The Court certainly cannot glean unconscionability in this waiver of warranty with respect to SHS. The commercial setting of the contract and its purpose and effect are clear to the Court.

any time to the present date. Plaintiff can only point to one ironer in existence with a guard and that guard was installed by the owner.

If it cannot be said that the sale of an early model machine is negligent, this Court will not hold its installation to be so in a case in which there is no later model which has the features in question, absent express guidance from the Courts of Virginia. Such a ruling would hold McClain liable as the guarantor of the ironer's safety with respect to the design deficiencies of the manufacturer. Additionally, since SHS did not ask McClain to make any modifications, it would also hold him liable for failure to render services the buyer did not request. McClain provided the services he was hired to provide. Therefore, if the ANSI and OSHA standards are demonstrative evidence of a breach of duty at all, that duty most properly rests with SHS, who is not a party to this suit.

## B. Duty to Warn

Plaintiff asserts that Martin and McClain each had a duty to warn SHS of the dangers associated with the feed drive unit. Under Virginia law, a seller violates a duty to warn "those whom the supplier should expect to use the chattel" when it

> (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied and (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous. *Besser Company v. Hansen*, 243 Va. 267 [415 S.E.2d 138] (1992), (quoting Restatement (Second) of Torts § 388 (1965)).

In its analysis of what constitutes reasonable care, the *Goodbar* Court said that "in Virginia there is no duty on product suppliers to warn employees of knowledgeable industrial purchasers as to product related hazards." 591 F.Supp. at 559, because, "where an employer is knowledgeable as to the dangers or defective conditions with a product, the supplier can reasonably rely upon the employer to protect his employees from any

harm." *Id.* at 560. Given the buyer's duty to warn its own employees, no such burden need be placed on the seller.

■ The evidence submitted in this case clearly establishes that SHS was knowledgeable about the dangers associated with the feed drive unit. Therefore, Buettner's claims against both Martin and McClain for negligent failure to warn cannot survive summary judgement. Paradee and George had extensive experience with flatwork ironers, and each was specifically aware of the danger posed by clothing in proximity to the feed-drive roll. (Paradee dep. p. 120; George dep. pp. 12–13; see also dep. of Warren p. 42). Additionally, SHS operated and maintained a total of five such ironers. Therefore, SHS must be considered a sophisticated buyer for the purposes of Buettner's claim against McClain.

Martin's motion on the duty to warn claim is even more compelling. Since McClain was an agent of SHS, his extensive experience, in addition to that of Paradee and George, can be attributed to SHS for the purposes of the claim against Martin. Plaintiff herself asserts that McClain was an expert in the safety and design of flatwork ironers for purposes of her failure to warn claim against him. (Shelley Jo Buettner's Memorandum in Opposition to Lawrence Leroy McClain's Motion for Summary Judgement, p. 6). Additionally, McClain actually disassembled and reassembled the particular ironer in question, giving him constructive knowledge as to any defect in the ironer's design. McClain also had specific knowledge of a prior incident in which an article of clothing had gotten caught in the feed drive unit of a flatwork ironer. (McClain dep. p. 51). Clearly then, reasonable minds cannot disagree that Martin sold the ironer to a knowledgeable industrial buyer.

■ Buettner also alleges that McClain, on a number of occasions before the accident, had seen her working near the ironers wearing the same sweater she wore when she was hurt. Even if the Court were to assume that a specific duty to warn an individual employee, independent of the general duty to warn all of the employees, can be created by wit-

nessing potentially dangerous behavior, plaintiff's duty to warn claim against McClain would still fail.

As supervisor, plaintiff bore at least partial responsibility for the safety of the employees on her shift, including instructing new employees about not wearing loose fitting clothing around any of the operating equipment. Despite her fourteen years of experience, plaintiff asserts that at the time of the accident she did not know and had never been told it was unsafe to wear loose clothing around moving equipment, (Buettner dep. at 105), although there is specific testimony to the contrary. (George dep. p. 13; Warren dep. p. 42). Even assuming plaintiff had no such knowledge, this Court can conclude as a matter of law that given her position as a supervisor, with responsibility for the safety of her employees, McClain was not negligent in believing that Buettner was aware of the hazard associated with clothing near the feed drive roll.

*Virginia Workers' Compensation Act*

Even if this court had found that defendant McClain was not entitled to summary judgement on the above issues, this Court would have granted his motion on other grounds. McClain asserts all of plaintiff's claims against him are barred under the Virginia Workers' Compensation Act ("VWCA"), Va.Code Ann. 65.2, *et seq.* (Michie 1991).[5] The Court concludes that McClain is shielded from the claims raised in this suit because he is not an "other party" under the Act, against whom these claims may be asserted.

The VWCA states that an injured employee's recovery under the Act "shall exclude all other rights and remedies ... at common law or otherwise, on account of such injury...." Va.Code Ann. § 65.2–307 (Michie 1991). An employer **"or those conducting his business** shall only be liable to an employee for personal injury ... by accident to the extent and in the manner herein specified." *Id.* at § 65.2–800(A) (emphasis added). The Act defines "those conducting [the employer's] business" as "any person whose

act results in an injury [that] arises out of and in the course of employment by an employer who is or may be liable for the payment of compensation." *Id.* 65.2–800(C). Thus, if an alleged tortfeasor is participating in the business of the injured party's employer at the time of the injury, the employer will be liable for compensating the injured party under the terms of the Act. If, however, the alleged tortfeasor is not participating in the business of the employer, he shall be deemed an "other party" under the Act, against whom traditional common law actions may be asserted. An independent contractor engaged in the business of the employer is sometimes referred to as a "statutory employee." *See Wood v. Joyce,* 1992 WL 189488, 1992 U.S.App.Lexis 18527 (4th Cir. 1992).

The test for determining whether an individual is an "other party" who may be sued in tort was first set forth in *Feitig v. Chalkley,* 185 Va. 96, 38 S.E.2d 73 (1946). In *Feitig,* the Court stated that an "other party" is one who is a stranger to the trade, occupation, or business in which the plaintiff was involved. *Id. See also Smith v. Horn,* 232 Va. 302, 351 S.E.2d 14 (1986). This test, which has been applied frequently over the years, must be applied based on the facts and circumstances of the particular case. *Bassett Furniture v. McReynolds,* 216 Va. 897, 902, 224 S.E.2d 323, 326 (1976).

In *Stewart v. Bass,* 223 Va. 363, 365, 288 S.E.2d 489, 490 (1982), a paper company leased a crane and an operator from a construction company for the purpose of removing an aerator from one of the paper company's lagoons. The plaintiff, an employee of the paper company, was supervising the removal of an aerator when he was injured due to the alleged negligence of the defendant construction company's crane operator. The lower court held that the plaintiff was barred from bringing suit against the construction company pursuant to the VWCA.

In affirming the lower court, the Virginia Supreme Court held that because the defendant was engaged in the business of the

---

**5.** The Court will refer to the amended version of the VWCA, which became effective in October, 1991. The amended version of the Act did not

substantially alter the corresponding sections under the older version which are relevant to this Court's analysis.

paper company, it was not an "other party," and therefore could not be sued under the VWCA. The Court noted that paper company employees, with the occasional help of the defendant, regularly removed the aerators and repaired them in the company shop. On the day in question, the plaintiff was supervising the removal with the help of two fellow employees and with the assistance of the crane operator. Since the defendant was merely assisting in routine maintenance regularly performed by paper company employees, it was not a stranger to the business. *But see Bassett,* 216 Va. at 902, 224 S.E.2d at 323 (defendant was an "other party" since it was performing major construction, unsupervised by the company's small maintenance division which normally only engaged in minor repairs and minor construction).

In the instant case, the plaintiff raises two contentions in asserting that defendant McClain is an "other party" against whom her claims may be asserted. First, she states that, pursuant to *Intermodal Services Inc. v. Smith,* 234 Va. 596, 364 S.E.2d 221 (1988), McClain, as an independent contractor, automatically falls within the definition of an "other party." Second, she states that even if this conclusion is not automatic, a close examination of McClain's duties illustrate that he performed tasks outside the scope of SHS's trade and, as a result, was a stranger to its business and an "other party" under the Act.

In support of her first point, the plaintiff relies upon *Intermodal Services,* where the Court held that the plaintiff was not barred by the VWCA because he was an independent contractor, not an employee, of the defendant and therefore did not fall within the limitations of the act. Buettner argues that a fair reading of *Intermodal* leads one to conclude that all independent contractors are exempted from the Act, regardless of whether they are plaintiffs or defendants in an action.

 In *Evans v. Hook,* 239 Va. 127, 387 S.E.2d 777 (1990), the Court rejected a similar argument made by the plaintiff, an employee of a subcontractor, who was injured due to the alleged negligence of the defendant, a self-employed architect working on the same construction project. The Court stated:

We said that it did not matter whether the defendant 'was an independent contractor or a fellow-servant of the plaintiff.... The purpose of the [Act] is to limit recovery to all persons engaged in the business of the employer to compensation under the Act and to deny an injured person the right of recovery against any other person unless he is a stranger to the business.

*Id.* at 131, 387 S.E.2d at 779 (citing *Lucas v. Biller,* 204 Va. 309, 315, 130 S.E.2d 582, 586 (1963)). In distinguishing *Intermodal,* the Court noted that:

Evans fails to recognize that before an employee can claim the benefits of the act, or be subject to its restrictions, he must be considered an employee under its terms. The *Intermodal* plaintiff, an independent contractor vis-a-vis the defendant, was simply not an employee under the act and, therefore, was not subject to its limitations in bringing his common-law action, even though the defendant was not a stranger to the employment.

On the other hand, the plaintiff in *Lucas* was an employee within the meaning of the act, and the defendant, who was not a stranger to the plaintiff's employment, was either a fellow-employee or an independent contractor entitled to statutory immunity from the injured employee's common-law action.

*Evans,* 239 Va. at 132, 387 S.E.2d at 779 (citations omitted); *Wood v. Joyce,* 1992 WL at 189488, 1992 U.S.App. at 18527. Thus, the identification of a defendant as an independent contractor does not automatically lead to the conclusion that he is an "other party" under the Act.

 The Court also finds no merit with plaintiff's second contention that McClain was a stranger to SHS's business. McClain was hired by Paradee to locate an ironer, supervise its disassembly, and monitor its installation at SHS. While McClain brought his own expertise to the project, his duties fit well within the scope of activities that SHS employees performed.

Part of SHS's trade or business in running its commercial laundry facility was purchasing, installing, operating and maintaining laundry equipment. Paradee, the president

of SHS, and Warren, SHS's Maintenance Supervisor, had examined and purchased laundry equipment in the past for SHS. SHS employees had previously purchased and installed at least three of the four other ironers at the SHS facility and Paradee was looking for a fifth ironer while McClain was conducting a simultaneous search. SHS employees unloaded the disassembled ironer in question and, with the supervision and assistance of McClain and an electrical company, helped to install the ironer at the SHS facility. Warren supervised the installation of the ironer and Paradee supervised the overall acquisition of the machine. While McClain's consultation was critical to the project, his activity fits well within the umbrella of business regularly performed by SHS.[6]

For the aforementioned reasons, the Court concludes that McClain is a statutory employee and not an "other party" under the Act. Accordingly, the plaintiff is limited to the relief provided under the VWCA and may not assert any additional claims against McClain.

IT IS SO ORDERED.

---

**6.** The Court is mindful of the fact that both Warren and Paradee stated that SHS employees could not have installed the ironer on their own because of their unfamiliarity with the new machine. *See* Warren Deposition at 15, 17; Paradee Deposition at 40–41.

While the installation of the iron in question required the particular expertise of McClain, this does not negate the fact that he was engaged in the same general type of work which SHS employees had performed in the past and had continued to perform at the time of this incident.