**In re SEPTEMBER 11 LITIGATION**

**No. 21 MC 97(AKH).**

United States District Court,
S.D. New York.

Sept. 9, 2003.

Marc S. Moller (Plaintiffs' Liaison Counsel), Brian J. Alexander, Kreindler & Kreindler LLP, New York, NY.

Michel F. Baumeister, Baumeister & Samuels, P.C. New York, NY, Kenneth P. Nolan, Speiser, Krause, Nolan & Granito,

P.C., New York, NY, Paul J. Hanley, Jr., Hanley & Conroy LLP, New York, NY, Baum, Hedlund, Aristei & Guilford, Los Angeles, CA, Warden Triplett Grier, Overland Park, KS, for Plaintiffs.

Desmond T. Barry, Jr. (Defendants' Liaison Counsel), Condon & Forsyth LLP, New York, NY, Roger E. Podesta, Debevoise & Plimpton, New York, NY, for Defendant American Airlines.

Jeffrey J. Ellis, Quick & Bakalor, P.C., New York, NY, Michael R. Feagley, Mayer, Brown, Rowe & Maw LLP, Chicago, IL, for Defendant United Air Lines.

James P. Connors, Jones Hirsch Connors & Bull, P.C., New York, NY, Gary W. Westerberg, Lord, Bissell & Brook, Chicago, IL, Paul V. Kelly, Kelly, Libby & Hoopes, P.C., Boston, MA, for Defendant Globe Aviation Services.

Charles E. Koob, Joseph F. Wayland, Simpson Thacher & Barlett LLP, New York, NY for Defendant Argenbright Security.

Edward J. McMurrer, Bruce R. Wildermuth, Mendes & Mount LLP, New York, NY, H. Lee Godfrey, Sussman Godfrey LLP, Houston, TX, for Defendant Huntleigh USA Corp.

William I. Sussman, Lee S. Gayer, Ropes & Gray LLP, New York, NY, Thomas J. McLaughlin, Steven C. Minson, Perkins Coie LLP, Seattle, WA, for Defendant The Boeing Co.

Mark Wood, O'Melveny & Meyers LLP, Los Angeles, CA, John L. Altieri, Jr., O'Melveny & Meyers LLP, New York, NY, Christopher D. Moore, Goodwin Proctor LLP, Boston, MA, for Defendant Massachusetts Port Authority.

Mark Dombroff, Dombroff & Gilmore, Washington, D.C., for Defendant Metropolitan Washington Airport Authority and The City of Portland Maine.

Peter B. Van Deventer, Jr., St. John & Wagner, LLC, Newark, NJ, for Defendant Continental Airlines.

Richard A. Williamson, M. Bradford Stein, Jason T. Cohen, Flemming, Zulack & Williamson LLP, New York, NY, for Defendants The Port Authority of New York & New Jersey and World Trade Center Properties, LLC.

### OPINION AND ORDER DENYING DEFENDANTS' MOTIONS TO DISMISS

HELLERSTEIN, District Judge.

The injured, and the representatives of the thousands who died from the terrorist-related aircraft crashes of September 11, 2001, are entitled to seek compensation. By act of Congress, they may seek compensation by filing claims with a Special Master established pursuant to the Air Transportation Safety and System Stabilization Act of 2001, Pub.L. No. 107–42, 115 Stat. 230 (2001) (codified at 49 U.S.C. § 40101) ("the Act"). Or they may seek compensation in the traditional manner, by alleging and proving their claims in lawsuits, with the aggregate of their damages capped at the limits of defendants' liability insurance. If they choose the former alternative, their claims will be paid through a Victim Compensation Fund from money appropriated by Congress, within a relatively short period after filing. Claimants will not have to prove fault or show a duty

to pay on the part of any defendant. The amount of their compensation, however, may be less than their possible recovery from lawsuits, for non-economic damages are limited to $250,000, economic damages are subject to formulas that are likely to be less generous than those often allowable in lawsuits, and punitive damages are unavailable. I have discussed, and upheld, certain portions of the Act and regulations related to the Fund in *Colaio v. Feinberg*, 262 F.Supp.2d 273 (S.D.N.Y.2003), *appeal filed*, June 6, 2003.

Approximately seventy of the injured and representatives of those who died, and ten entities which sustained property damage, have chosen to bring lawsuits against defendants whom they claim are legally responsible to compensate them: the airlines, the airport security companies, the airport operators, the airplane manufacturer, and the operators and owners of the World Trade Center.[1] The motions before me challenge the legal sufficiency of these lawsuits, and ask me to dismiss the complaints because no duty to the plaintiffs existed and because the defendants could not reasonably have anticipated that terrorists would hijack several jumbo jet airplanes and crash them, killing passengers, crew, thousands on the ground, and themselves. I discuss in this opinion the legal duties owed by the air carriers, United and American Airlines, and other airlines and airport security companies affiliated with the air carriers to the plaintiffs who were killed and damaged on the ground in and around the Twin Towers and the Pentagon; by the Port Authority of New York and New Jersey ("Port Authority") and World Trade Center Properties LLC ("WTC Properties") to those killed and injured in and around the Twin Towers;

and by the Boeing Company, the manufacturer of the "757" jets that were flown into the Pentagon and the field near Shanksville, Pennsylvania, to those killed and injured in the two crashes. I hold in this opinion that each of these defendants owed duties to the plaintiffs who sued them, and I reject as well defendants' alternative arguments for dismissal.

## I. Background

### A. Exclusive Jurisdiction and the Governing Law

The Air Transportation Safety and System Stabilization Act of 2001, Pub.L. No. 107–42, 115 Stat. 230 (2001) (codified at 49 U.S.C. § 40101) ("the Act"), passed in the weeks following the September 11 attacks, provides that those who bring suit "for damages arising out of the hijacking and subsequent crashes" must bring their suits in the United States District Court for the Southern District of New York. The Southern District has "original and exclusive jurisdiction" "over all actions brought for any claim (including any claim for loss of property, personal injury, or death) resulting from or relating to the terrorist-related aircraft crashes of September 11, 2001," with the exception of claims to recover collateral source obligations and claims against terrorists and their aiders, abettors and conspirators, Act § 408(c). The Act provides that the governing law shall be "derived from the law, including choice of law principles, of the State in which the crash occurred unless such law is inconsistent with or preempted by Federal law." Act § 408(b)(2). Thus, all cases, whether arising out of the crashes in New York, Virginia, or Pennsylvania, must be brought in the Southern District of New York, to be decided in accordance

---

1. Many more actions have been brought by claimants who have not yet decided between pursuing compensation through litigation or the Fund. These cases have been placed on the suspense docket pursuant to my orders of September 6, 2002 and July 22, 2003.

with the law of the state where the crash occurred.

## B. *The Complaints*

Plaintiffs' individual pleadings have been consolidated into five master complaints, one for the victims of each crash and one for the property damage plaintiffs. Plaintiffs allege that the airlines, airport security companies, and airport operators negligently failed to fulfill their security responsibilities, and in consequence, the terrorists were able to hijack the airplanes and crash them into the World Trade Center, the Pentagon, and the field in Shanksville, Pennsylvania, killing passengers, crew, and thousands in the World Trade Center and the Pentagon and causing extensive property damage. The complaints allege that the owners and operators of the World Trade Center, World Trade Center Properties LLC and the Port Authority of New York and New Jersey, negligently designed, constructed, maintained, and operated the buildings, failing to provide adequate and effective evacuation routes and plans. Plaintiffs who died in the crashes of American flight 77 and United flight 93 also sue Boeing, the manufacturer of the two "757" airplanes, for strict tort liability, negligent product design, and breach of warranty.

## C. *Motions to Dismiss*

I heard oral argument on May 1 and 2, 2003 on six motions by the several categories of defendants. I previously have decided three of the motions, by most of the airport operators,[2] by three airlines that did not carry any of the victims or alleged hijackers,[3] and by Fiduciary Trust Company International and Franklin Templeton Investments, an employer of one of the victims.[4] The three motions which remain, and which I now decide are: by the airlines and airport security companies (the "Aviation Defendants");[5] by the Port Authority and World Trade Center Properties LLC (together, the "WTC Defendants"); and by Boeing.

The Aviation Defendants concede that they owed a duty to the crew and passen-

---

2. The airport operators that joined in this motion are: the Massachusetts Port Authority, the Metropolitan Washington Airport Authority, the City of Portland, Maine, and the Port Authority of New York and New Jersey. I denied their joint motion without prejudice. (Order of May 5, 2003, *In re September 11 Litigation*, 21 MC 97.) The City of Portland, Maine and the Port Authority of New York and New Jersey brought separate supplementary motions to dismiss. I granted Portland's motion, dismissing it as a defendant from those cases where plaintiffs had failed to file a timely notice of claim. *In re September 11 Litigation*, 265 F.Supp.2d 208 (S.D.N.Y.2003). The Port Authority's supplementary motion will be decided herein, *see infra* Part II.B.iv.

3. The three non-carrier airlines are Continental Airlines, Air Canada, and America West Airlines. I denied their motion for summary judgment without prejudice. (Order of May 5, 2003, *In re September 11 Litigation*, 21 MC 97.)

4. (Order of May 13, 2003, *Greene–Wotton v. Fiduciary Trust Co. Int'l*, 02 Civ. 7245.) The plaintiff's husband had worked for Fiduciary Trust/Franklin Templeton in Tower Two and was allegedly asked to remain at the office after Tower One had been struck. I held that the New York workers' compensation statute precluded plaintiff's negligence claims and that she had failed to state a claim for intentional infliction of emotional distress.

5. The Aviation Defendants who joined in the motion to dismiss include: AirTran Airlines, American Airlines, America West Airlines, AMR Corp., Argenbright Security, Atlantic Coast Airlines, Burn International Services Corp., Burns International Security Services Corp., Colgan Air, Continental Airlines, Delta Air Lines, Globe Aviation Services Corp., Globe Airport Security Services, Inc., Huntleigh USA Corp., Northwest Airlines, Pinkerton's Inc., and United Air Lines.

gers on the planes, but contend that they did not owe any duty to "ground victims." The Port Authority and WTC Properties argue that they did not owe a duty to protect occupants in the towers against injury from hijacked airplanes and, even if they did, the terrorists' actions broke the chain of proximate causation, excusing any negligence by the WTC Defendants. And Boeing argues that it did not owe a duty to ground victims or passengers, and that any negligence on its part was not the proximate cause for the harms suffered by the plaintiffs.

## II. Discussion

Defendants' motions were made pursuant to Fed.R.Civ.P. 12(b)(6).[6] A Rule 12(b)(6) motion requires the court to determine if plaintiff has stated a legally sufficient claim. A motion to dismiss under Rule 12(b)(6) may be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Branum v. Clark,* 927 F.2d 698, 705 (2d Cir.1991). The court's function is "not to assay the weight of the evidence which might be offered in support" of the complaint, but "merely to assess the legal feasibility" of the complaint. *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980). In evaluating whether plaintiff could ultimately prevail, the court must take the facts alleged in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.,* 32 F.3d 697, 699–700 (2d Cir.1994).

### A. Aviation Defendants' Motion to Dismiss

The Aviation Defendants argue that they did not owe a duty to the ground victims; that the injuries suffered by the plaintiffs were beyond the scope of any foreseeable duty that may have been owed; and that the federal laws that regulate aviation preempt any state law to the contrary.

#### i. Choice of Law

Section 408(b)(2) of the Act provides that the substantive law "shall be derived from the law, including choice of law principles, of the State in which the crash occurred unless such law is inconsistent with or preempted by Federal law." Ground victims of the planes that crashed into the World Trade Center and the Pentagon have filed suit against the Aviation Defendants, and thus the choice of law principles of New York and Virginia apply.

■ New York typically analyzes choice-of-law issues in tort cases according to two categories of rules: conduct-regulating and loss-allocating. The issue of duty—whether duty exists and its scope— is conduct-regulating. New York choice of law dictates that the state in which the tort took place has the strongest interest in applying its conduct-regulating rules. *Schultz v. Boy Scouts of Am., Inc.,* 65 N.Y.2d 189, 491 N.Y.S.2d 90, 480 N.E.2d 679, 684–85 (1985). Thus, the substantive law of New York governs the issue of duty in relation to the crashes at the World Trade Center.

---

**6.** Defendant WTC Properties had answered the complaints in *Friedlander v. Port Auth. of N.Y. and N.J.,* 02 Civ. 7171, *Broghammer v. Port Auth. of N.Y. and N.J.,* 02 Civ. 7174, and *Baksh v. Port Auth. of N.Y. and N.J.,* 02 Civ. 7224, prior to filing its motion, and thus moves under Fed.R.Civ.P. 12(c). The standards to dismiss under Fed.R.Civ.P. 12(b)(6) and 12(c) are identical. *D'Alessio v. New York Stock Exch., Inc.,* 258 F.3d 93, 99 (2d Cir.2001).

■ Virginia's choice of law rules apply to the ground damage claims arising from the crash of American flight 77 into the Pentagon. Under Virginia law, the substantive law of the place of the tort controls. *McMillan v. McMillan*, 219 Va. 1127, 253 S.E.2d 662, 664 (1979). The parties agree that the law of Virginia does not differ materially from New York law with respect to the issue of duty and rely on New York law for their arguments.

### ii. *Existence of Duty to Ground Victims*

■ "The threshold question in any negligence action is: does the defendant owe a legally recognized duty of care to plaintiff?" *Hamilton v. Beretta U.S.A. Corp.*, 96 N.Y.2d 222, 727 N.Y.S.2d 7, 750 N.E.2d 1055, 1060 (2001). In New York, the existence of a duty is a "legal, policy-laden declaration reserved for judges." *Palka v. Servicemaster Mgmt. Servs. Corp.*, 83 N.Y.2d 579, 611 N.Y.S.2d 817, 634 N.E.2d 189, 192 (1994). The injured party must show that a defendant owed not merely a general duty to society but a specific duty to the particular claimant, for "without a duty running directly to the injured person there can be no liability in damages, however careless the conduct or foreseeable the harm." *Lauer v. City of New York*, 95 N.Y.2d 95, 711 N.Y.S.2d 112, 733 N.E.2d 184, 187 (2000). Courts traditionally "fix the duty point by balancing factors, including the reasonable expectations of parties and society generally, the proliferation of claims, the likelihood of unlimited or insurer-like liability, disproportionate risk and reparation allocation, and public policies affecting the expansion or limitation of new channels of liability." *Palka*, 611 N.Y.S.2d 817, 634 N.E.2d at 193.

■ New York courts have been cautious in extending liability to defendants for their failure to control the conduct of others, "even where as a practical matter [the] defendant can exercise such control." *D'Amico v. Christie*, 71 N.Y.2d 76, 524 N.Y.S.2d 1, 518 N.E.2d 896, 901 (1987). "This judicial resistance to the expansion of duty grows out of practical concerns both about potentially limitless liability and about the unfairness of imposing liability for the acts of another." *Hamilton*, 727 N.Y.S.2d 7, 750 N.E.2d at 1061. However, courts have imposed a duty when the defendant has control over the third party tortfeasor's actions, or the relationship between the defendant and plaintiff requires the defendant to protect the plaintiff from the conduct of others. As the New York Court of Appeals ruled, "The key in each [situation] is that the defendant's relationship with either the tortfeasor or the plaintiff places the defendant in the best position to protect against the risk of harm." *Id.* One additional consideration, the Court of Appeals added, is that "the specter of limitless liability is not present because the class of potential plaintiffs to whom the duty is owed is circumscribed by the relationship." *Id.*

■ Plaintiffs allege that the Aviation Defendants negligently failed to carry out their duty to secure passenger aircraft against potential terrorists and weapons smuggled aboard, enabling the terrorists to hijack and crash four airplanes. Plaintiffs argue that the Aviation Defendants employed their security measures specifically to guard against hijackings, and knew or should have known that the hijacking of a jumbo jet would create substantial risks of damage to persons and property, not only to passengers and crew, but also to people and property on the ground. Plaintiffs assert also that terrorism was a substantial international concern, and that suicidal acts by terrorists seeking to cause death, injury and havoc to as many inno-

cent people as possible had become a frequently used strategy.

I must test this dispute over duty even before a record has been established. In New York, duty is a legal question, for the judge to decide. I must assume, for the purpose of the motion, that all well-pleaded facts about the defendants' negligence are true and will in time be proved, and that defendants' negligence proximately caused the injuries and deaths upon which plaintiffs filed their lawsuits.

Airplane crashes in residential areas are not unknown. In January 1952, an American Airlines Convair crashed into a residential area of Elizabeth, New Jersey on its approach to Newark airport, killing passengers and crew, as well as seven residents of houses it struck. *Elizabeth Recalls First of 3 Crashes,* N.Y. Times, Dec. 17, 1952, at 27. A month later, another plane out of Newark, a National Airlines DC–6, struck an apartment house in New Jersey, killing 29 passengers and four tenants of the apartment house. *Id.* Military airplanes have had to make emergency landings on highways, and have collided with automobiles. *See Rehm v. United States,* 196 F.Supp. 428 (E.D.N.Y.1961). On July 9, 1982, a Pan American World Airways jet crashed shortly after takeoff, killing all on board and eight individuals on the ground. The airline and the government acknowledged liability for the crash, which was caused by windy conditions. *Pan Am and U.S. Accept Responsibility for Crash,* N.Y. Times, May 13, 1983, at 6. In January 1990, a Columbian passenger airplane exhausted its fuel supply while circling La Guardia Airport waiting for clearance to land, and crashed into a residential backyard in Long Island's populated North shore. *See In re Air Crash Disaster at Cove Neck,* 885 F.Supp. 434 (E.D.N.Y.1995). On November 12, 2001, two months after the aircraft crashes of

September 11, 2001, a jumbo-jet passenger airplane lost its stability in take-off from JFK airport and crashed into a populated area of the Rockaways, causing the deaths of over two hundred passengers and crew members and five people on the ground. Dan Barry and Elissa Gootman, *5 Neighbors Gone,* N.Y. Times, Nov. 14, 2001, at D11. Such incidents are inevitable in the context of the sheer number of miles flown daily in the United States. None matches the quantity or quality of tragedy arising from the terrorist-related aircraft crashes of September 11.

Airlines typically recognize responsibility to victims on the ground. *See, e.g., Rehm,* 196 F.Supp. at 428; *Cove Neck,* 885 F.Supp. at 439–40. As counsel for the Aviation Defendants stated in argument,

Assuming negligence and assuming there is damage to houses on the ground that is the type of traditional ground damage negligent maintenance cases in which the courts have imposed duty.... [W]e would concede in those circumstances assuming the facts of liability are proven there is a legal duty.

(Tr. of May 1, 2003 at 8.) However, counsel did not concede duty in relation to those killed and injured on the ground in the September 11, 2001 aircraft crashes. The "potential for a limitless liability to an indeterminate class of plaintiffs," he argued, made the instant cases distinguishable. *Id.* The distinction, in his opinion, is "no[t][a] difference in kind," but "the law of extraordinary consequences [which] can sometimes draw a distinction based on degree." *Id.* at 9–10. He explained:

We are in an area of policy and there are lines to be drawn that may occasionally seem arbitrary. But what really distinguishes our case from [the hypothetical example of an airplane crash into Shea Stadium while taking off from, or landing at, La Guardia airport] is the

intentional intervening acts of the third party terrorists.[7]

*Id.* As defense counsel commented, "we are in an area of policy," where "the existence and scope of a tortfeasor's duty is ... a legal question for the courts," *532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Center, Inc.*, 96 N.Y.2d 280, 727 N.Y.S.2d 49, 750 N.E.2d 1097, 1101 (2001) (Kaye, Ch. J.).

It is the court's job to "fix the duty point by balancing factors," including the following:

> the reasonable expectations of parties and society generally, the proliferation of claims, the likelihood of unlimited or insurer-like liability, disproportionate risk and reparation allocation, and public policies affecting the expansion or limitation of new channels of liability.

*Id.* (citation omitted). *532 Madison Avenue* involved collapses of a high-rise office building and a 48–story construction elevator tower, both in midtown Manhattan and both causing busy areas of the city to be closed for a two-week period. The lawsuits sought recovery of financial losses resulting from the closures; plaintiffs had not suffered personal injury or property damage. Applying the considerations set out above, the Court of Appeals limited the scope of defendants' duty "to those who have, as a result of these events, suffered personal injury or property damage," but held that those who suffered merely financial losses could not recover. *Id.* at 1103. The Court of Appeals acknowledged that "[p]olicy-driven line-drawing is to an extent arbitrary because, wherever the line is drawn, invariably it cuts off liability to persons who foreseeably might be plaintiffs." *Id.* If those who suffered financial losses were to be allowed to sue, the Court of Appeals held, "an indeterminate group in the affected areas" would be able to recover. *Id.* If, however, the field of plaintiffs was to be limited to those who "suffered personal injury or property damage" as a result of defendants' negligence, the limitation would "afford[ ] a principled basis for reasonably apportioning liability," and be "historically" consistent with New York precedents. *Id.*

The cases before me involve claims to recover for personal injuries, death, or property damage. They fall within the line drawn by the New York Court of Appeals in *532 Madison Avenue*. There may be more plaintiffs within the ambit of duty at issue here than those contemplated under the rule set forth in *532 Madison Avenue*, but that is not a principled basis of distinction. I therefore hold that the Aviation Defendants owed a duty of care, not only to their passengers to whom they concede they owed this duty, but also to victims on the ground.

In terms of the *532 Madison Avenue* analysis, plaintiffs are favored by the first of the factors set out above, for plaintiffs and society generally could have reasonably expected that the screening performed at airports by the Aviation Defendants would be for the protection of people on the ground as well as for those in airplanes. Ours is a complicated and specialized society. We depend on others charged with special duties to protect the quality of the water we drink and the air we breathe, to bring power to our neighborhoods, and to enable us to travel with a sense of security over bridges, through tunnels and via subways. We live in the vicinity of busy airports, and we work in

---

7. While defense counsel raised the issue of proximate causation during the oral argument, the issue was not briefed. Counsel suggested, without legal citation, that the extraordinary nature of the attacks, involving intervening acts by the terrorists, should negate the duty air carriers owed to ground victims.

tall office towers, depending on others to protect us from the willful desire of terrorists to do us harm. Some of those on whom we depend for protection are the police, fire and intelligence departments of local, state and national governments. Others are private companies, like the Aviation Defendants. They perform their screening duties, not only for those boarding airplanes, but also for society generally. It is both their expectation, and ours, that the duty of screening was performed for the benefit of passengers and those on the ground, including those present in the Twin Towers on the morning of September 11, 2001.

Nothing that I hold or say should be considered as any form of ruling on the reasonableness of the Aviation Defendants' conduct. Nor should it be construed as a finding on whether their conduct was the proximate cause of plaintiffs' damages, or whether that of the terrorists' constituted an intervening act breaking the chain of causation. I simply hold that the Aviation Defendants, and plaintiffs and society generally, could reasonably have expected that the screening methods at Logan, Newark, and Dulles airports were for the protection of people on the ground as well as for those on board the airplanes that the terrorists hijacked.

The second factor to consider is "the proliferation of claims." *532 Madison Ave.,* 727 N.Y.S.2d 49, 750 N.E.2d at 1101. Proliferation, however, should not be mistaken for size of number. As long as the claimants are known and circumscribed by those "who have, as a result of these events, suffered personal injury or property damage," there is not an impermissible proliferation. *See id.* at 1103. *See also In*

*re Air Crash Disaster at Cove Neck,* 885 F.Supp. 434, 439–440 (E.D.N.Y.1995) (allowing claims of emotional injury only for those who also suffered physical injury).

Plaintiffs, the ground victims in the cases before me, complain of directly-caused physical injuries to their persons or property. Their number may be large,[8] tragically large, and the potential liability may be substantial if negligence and cause is proven, but the class is not indefinite and claims at this point cannot proliferate. Furthermore, the defendants will be liable only if plaintiffs sustain their burden of proof, with the aggregate liability of the air carriers, aircraft manufacturers, airport sponsors, and persons with a property interest in the World Trade Center capped by federal statute to the limits of their liability insurance coverage. Act § 408(a)(1). Thus, "the likelihood of unlimited or insurer-like liability," the third factor of *532 Madison Avenue,* does not weigh heavily against a finding of duty.

The fourth factor of *532 Madison Avenue* is "disproportionate risk and reparation allocation." This inquiry probes who was best able to protect against the risks at issue and weighs the costs and efficacy of imposing such a duty. The airlines, and the airport security companies, could best screen those boarding, and bringing objects onto, airplanes. The same activities reasonably necessary to safeguard passengers and crew are those that would protect the public as well. Hijacking presents a substantial elevation of risks, not only to those aboard the hijacked airplane, but also to those on the ground. This case is thus distinguishable from other cases where courts did not find a duty to protect against third-party conduct. In *Waters v.*

---

**8.** The most recent statistics show that 3,016 people died in the attacks at the World Trade Center and the Pentagon, and in the crash into the Shanksville, Pennsylvania field. Di-ana Henriques, *Concern Growing as Families Bypass 9/11 Fund,* N.Y. Times, Aug. 31, 2003 at A1.

*New York City Housing Authority*, the court held that the owner of a housing project did not owe a duty to a passerby when she was dragged off the street into the building and assaulted. 69 N.Y.2d 225, 513 N.Y.S.2d 356, 505 N.E.2d 922 (1987). Imposing such a duty on landowners would do little to minimize crime, and the social benefits to be gained did not warrant the extension of the landowner's duty. *See id.* at 924. Similarly, in *Hamilton*, 727 N.Y.S.2d 7, 750 N.E.2d at 1062, the court held that gun manufacturers did not owe a duty to victims of gun violence for negligent marketing and distribution of firearms. The connection between the manufacturers, criminal wrongdoers, and victims was too remote, running through many links in a long chain, from manufacturer, distributor or wholesaler, retailer, legal purchasers, unlawful possessors, and finally to the victims of gun violence. The court stated:

> To impose a general duty of care upon the makers of firearms under these circumstances because of their purported ability to control marketing and distribution of their products would conflict with the principle that any judicial recognition of a duty of care must be based upon an assessment of its efficacy in promoting a social benefit as against its costs and burdens. Here, imposing such a general duty of care would create not only an indeterminate class of plaintiffs but also an indeterminate class of defendants whose liability might have little relationship to the benefits of controlling illegal guns.

*Id.* at 1063. Unlike *Hamilton* and *Waters*, the Aviation Defendants could best control the boarding of airplanes, and were in the best position to provide reasonable protection against hijackings and the dangers they presented, not only to the crew and passengers, but also to ground victims. Imposing a duty on the Aviation Defen-

dants best allocates the risks to ground victims posed by inadequate screening, given the Aviations Defendants' existing and admitted duty to screen passengers and items carried aboard.

Lastly, recognition of a duty on the part of the Aviation Defendants would not substantially expand or create "new channels of liability," the fifth and last factor of *532 Madison Avenue*. New York courts have found on other occasions that aircraft owners and operators owe a duty to those on the ground who may be harmed or sustain property damage resulting from improper or negligent operation of an aircraft. *See, e.g., Hassanein v. Avianca Airlines*, 872 F.Supp. 1183, 1188–90 (E.D.N.Y.1995) (denying defendant's motion for summary judgment where plane crash could have caused a handrail in plaintiff's house to loosen, causing her fall down the stairs); *Rehm v. United States*, 196 F.Supp. 428, 430–31 (E.D.N.Y.1961) (awarding damages where car occupants were hit by a plane which crashed after engine failure); *Schneider v. United States*, 188 F.Supp. 911, 915 (E.D.N.Y.1960) (same). *Cf. In re Air Crash Disaster at Cove Neck*, 885 F.Supp. 434, 439–440 (E.D.N.Y.1995) (ground victims of plane crash could only sustain claim if they suffered personal injury or property damage). Although these cases involved injuries resulting from negligent operation or maintenance of airplanes, rather than negligence in regulating the boarding of airplanes, there is no principled distinction between the modes of negligence. The same general principle governs, that air carriers owe a duty to people on the ground as well as to passengers and crew.

The Second Circuit has recognized that airlines have a duty not only to passengers on the flights they operate, but also to passengers on connecting flights, and thus may be liable when they allow terrorists

to board planes. In *Stanford v. Kuwait Airways Corp.*, 89 F.3d 117 (2d Cir.1996), the airline failed adequately to screen passengers against terrorists. The hijacking occurred, not on the airplane initially boarded, but on the connecting flight. The Second Circuit, relying on general tort principles including New York law, upheld the air carrier's duty of care as to the passengers on the connecting flight. *Id.* at 125. Clearly, the duty of care extends to cover those embraced by the risk of the terrorists' conduct.

Accordingly, I hold on the pleadings that the Aviation Defendants owed a duty of care to the ground victim plaintiffs.

### iii. *Scope of Duty to Ground Victims: the Issue of Foreseeability*

█ Defendants argue that the ground victims lost their lives and suffered injuries from an event that was not reasonably foreseeable, for terrorists had not previously used a hijacked airplane as a suicidal weapon to destroy buildings and murder thousands. Defendants contend that because the events of September 11 were not within the reasonably foreseeable risks, any duty of care that they would owe to ground victims generally should not extend to the victims of September 11.

█ The scope of duty to a particular class of plaintiffs depends on the relationship to such plaintiffs, whether plaintiffs were within a zone of foreseeable harm, and whether the harm was within the class of reasonably foreseeable hazards that the duty exists to prevent. *Di Ponzio v. Riordan*, 89 N.Y.2d 578, 657 N.Y.S.2d 377, 679 N.E.2d 616, 618 (1997) (citations omitted). *See also Palsgraf v. Long Island R.R. Co.*, 248 N.Y. 339, 162 N.E. 99, 100–01 (1928). While foreseeability is generally for the fact finder to resolve, courts may dismiss cases where the risks are unforeseeable as a matter of law. *Sanchez*

*v. State of New York*, 99 N.Y.2d 247, 754 N.Y.S.2d 621, 784 N.E.2d 675, 678 (2002). "The nature of the inquiry depends, of course, on the particular facts and circumstances in which the duty question arises." *Di Ponzio*, 657 N.Y.S.2d 377, 679 N.E.2d at 618.

█ In order to be considered foreseeable, the precise manner in which the harm was inflicted need not be perfectly predicted. As *Di Ponzio v. Riordan* explained: "Where an individual breaches a legal duty and thereby causes an occurrence that is within the class of foreseeable hazards that the duty exists to prevent, the individual may be held liable, even though the harm may have been brought about in an unexpected way. On the other hand, no liability will result when the occurrence is not one that is normally associated with such hazards. Significantly, the kind and number of hazards encompassed within a particular duty depend on the nature of the duty." 657 N.Y.S.2d 377, 679 N.E.2d at 619. However, courts must be careful to draw a line between remote possibilities and those that are reasonably foreseeable in order to prevent the imposition of liability "with the wisdom born of the event." *Id.* (citation omitted).

New York cases emphasize that courts must closely examine the nature of the duty owed and the injury sustained in order to determine if the injury was within a class of foreseeable risks. *Di Ponzio* held that the alleged misconduct of defendant's employees—gas station attendants who failed to require a customer to turn off his engine while getting gas—did not give rise to liability from a risk that was not associated with the duty of care. In that case, a car that had been left running slid backward, striking the plaintiff. The court found that the injuries sustained by the plaintiff were not among the hazards associated with leaving a car engine run-

ning during the operation of a gas pump. *See id.* at 620. The duty existed to avoid fire and explosion, not to protect against a vehicle that was not properly braked.

Construing the factual allegations in the light most favorable to the plaintiffs, I conclude that the crash of the airplanes was within the class of foreseeable hazards resulting from negligently performed security screening. While it may be true that terrorists had not before deliberately flown airplanes into buildings, the airlines reasonably could foresee that crashes causing death and destruction on the ground was a hazard that would arise should hijackers take control of a plane. The intrusion by terrorists into the cockpit, coupled with the volatility of a hijacking situation, creates a foreseeable risk that hijacked airplanes might crash, jeopardizing innocent lives on the ground as well as in the airplane. While the crashes into the particular locations of the World Trade Center, Pentagon, and Shanksville field may not have been foreseen, the duty to screen passengers and items brought on board existed to prevent harms not only to passengers and crew, but also to the ground victims resulting from the crashes of hijacked planes, including the four planes hijacked on September 11.

Defendants point to two decisions in cases brought against manufacturers and distributors of ammonium nitrate utilized in the Oklahoma City bombing and the 1993 attack on the World Trade Center. Relying on either New York or New Jersey law and on Oklahoma law, the courts found that the fertilizer products were not themselves dangerous and served socially useful purposes. In *Gaines–Tabb v. ICI Explosives USA, Inc.*, the district court ruled that the manufacturer did not owe a duty to the plaintiffs because the manufacturer did not expose the plaintiffs to a "recognizable high degree of risk of harm through the misconduct of third persons which a reasonable person would take into account." 995 F.Supp. 1304, 1317 (W.D.Okla.1996) (citation omitted). On appeal, the Tenth Circuit affirmed, but on the ground that the terrorists' actions served as the supervening cause for the plaintiffs' injuries. 160 F.3d 613, 620 (10th Cir.1998). In *Port Authority of New York and New Jersey v. Arcadian Corp.*, the Third Circuit held that the manufacturers and distributors of ammonium nitrate did not owe a duty to the plaintiffs, because the product had been substantially altered after leaving the defendants' control, and because only the altered product created the danger to the plaintiff. 189 F.3d 305, 317 (3d Cir.1999). "[D]efendants' products were not in and of themselves dangerous but were merely the raw materials or components that terrorists used in combination with other ingredients to build a bomb." *Id.* at 313.

The cases are distinguishable. Ammonium nitrate is a socially and economically useful product. To require manufacturers to prevent the appropriation of their products for an unintended purpose when manufacturers have no control over who purchases and alters the fertilizer would be an undue burden. Unlike the manufacturers, however, the Aviation Defendants controlled who came onto the planes and what was carried aboard. They had the obligation to take reasonable care in screening precisely because of the risk of terrorist hijackings, and the dangerous consequences that would inevitably follow. The consequences that in fact followed were within the scope of the duty that the Aviation Defendants undertook to carry out.

I hold at this stage of the litigation, on the pleadings and before any discovery has taken place, that the injuries suffered by the ground victims arose from risks that

were within the scope of the duty undertaken by the Aviation Defendants.

### iv. *Federal Law Preemption*

██ Defendants argue that federal law preempts plaintiffs' claims and that an imposition of a duty of care on the part of the Aviation Defendants in favor of ground victims would be "inconsistent with" the air safety provisions of federal law. Section 408(b)(2) of the Act provides: "The substantive law for decision in any such suit shall be derived from the law, including choice of law principles, of the state in which the crash occurred unless such law is inconsistent with or preempted by Federal law." Defendants contend that since federal regulations providing for protection of passengers and property on aircraft in the event of air piracy do not mention people or property on the ground, it would be inconsistent with the regulatory scheme to impose a duty on the Aviation Defendants towards ground victims. *See* 49 U.S.C. § 44903(b) (mandating the promulgation of "regulations to protect passengers and property on an aircraft" against acts of criminal violence or aircraft piracy); 14 C.F.R. § 107.3(a)(1) (2001) (air carrier security programs shall "[p]rovide for the safety of persons and property traveling in air transportation and intrastate air transportation against acts of criminal violence and air privacy"). They also contend that the Federal Aviation Administration's "common strategy" approach of full cooperation with the hijackers demonstrates the policy of protecting those on board. Thus, because federal regulations and the FAA's terrorist countermeasures did not account for the lives of ground victims, the Aviation Defendants believe they did not owe a duty under federal law to the ground victims.

 There is no beginning assumption against preemption in those areas of the law "where there has been a history of significant federal presence." *United States v. Locke*, 529 U.S. 89, 108, 120 S.Ct. 1135, 146 L.Ed.2d 69 (2000). In areas in which there has been a history of significant federal control, courts "must ask whether the local laws in question are consistent with the federal statutory structure," rather than assuming that "concurrent regulation by the State is a valid exercise of its police powers." *Id.* Aviation is clearly an area with a significant history of federal control.

The courts have taken different positions on the scope of preemption in the aviation context. ·For example, the First and Third Circuits, as well as courts in this district, have held that federal law establishes the applicable standards of care in the field of aviation. *Abdullah v. American Airlines*, 181 F.3d 363 (3d Cir.1999) (examining a claim brought by passengers injured during flight as a result of turbulence and concluding that traditional state and territorial law remedies continue to exist for violation of federal standards); *French v. Pan Am Express, Inc.*, 869 F.2d 1 (1st Cir.1989) (holding that Federal Aviation Act's prescriptions for the employment of pilots preempted state statute regulating drug testing for employees); *Curtin v. Port Auth. of N.Y. and N.J.*, 183 F.Supp.2d 664 (S.D.N.Y.2002) (finding proper removal of state law claims accusing an airline of negligent supervision and control of emergency evacuation procedures because the comprehensive federal regulatory scheme covering emergency evacuation procedures · preempts state law); *Schaeffer v. Cavallero*, 29 F.Supp.2d 184 (S.D.N.Y.1998) (federal law, not state law, determines right of air carrier to refuse to transport, and to evict, passenger). A few courts have taken a different approach, holding that federal law does not always preempt state law tort claims. *See*

*Cleveland v. Piper Aircraft Corp.*, 985 F.2d 1438, 1444 (10th Cir.1993) (holding that Congress has not indicated a "clear and manifest" intent to occupy the field of airplane safety to the exclusion of state common law); *Sakellaridis v. Polar Air Cargo, Inc.*, 104 F.Supp.2d 160, 163 (E.D.N.Y.2000) (claims by airline mechanic injured while servicing large aircraft may be brought under New York Labor Law and are not preempted by federal statutes relating to safety equipment).

These cases do not involve the issue of duty. Preemption is generally found, not in connection with the existence and scope of duty, but in connection with the standards governing the conduct and procedures relating to aviation—the standard of care, that is, by which an air carrier must carry out its activities. Defendants have not shown any inconsistency between the law of duty provided by New York law and federal statutes or regulations. The FAA may not have predicted a hijacking that had as its purpose crashing the airplane into a heavily occupied office tower, but that says nothing about the extent, or limitation, of the duty of the screening procedures that the Aviation Defendants performed. The federal regulations do not suggest that crashes of hijacked airplanes and death and destruction to people on the ground as well as in the airplanes were unforeseeable as a matter of law.

I therefore hold that New York's law of duty is not inconsistent with, or preempted by, federal law.

~

For the reasons stated, I deny the Aviation Defendants' motion to dismiss the claims of the ground victims.

### B. World Trade Center Defendants' Motions to Dismiss

#### i. Background

The Port Authority of New York and New Jersey and WTC Properties LLC move to dismiss all claims brought against them as owners and operators of the World Trade Center[9] for loss of life, personal injury, and damage to nearby property and businesses resulting from the collapse of the Twin Towers. The claims are alleged in two Master Complaints regarding Flights 11 and 175 in the consolidated litigation, and in numerous individual complaints.[10] Plaintiffs allege that the WTC Defendants: 1) failed to design and construct the World Trade Center buildings according to safe engineering practices and to provide for safe escape routes and adequate sprinkler systems and fireproofing; 2) failed to inspect, discover, and repair unsafe and dangerous conditions, and to maintain fireproofing materials; 3) failed to develop adequate and safe evacuation and emergency management plans; 4) failed to apply, interpret and/or enforce

9. A number of other defendants whose interests are aligned with the Port Authority and World Trade Center Properties LLC—those who were named as defendants because they designed, constructed, operated, or maintained the World Trade Center buildings—were voluntarily dismissed earlier in the litigation.

10. The individual ground victim cases are: *Friedlander v. United Airlines*, 02 Civ. 7171; *Broghammer v. United Airlines*, 02 Civ. 7174; *Gabrielle v. United Airlines*, 02 Civ. 7176; *Re-*

*genhard v. American Airlines*, 02 Civ. 7177; *Ashton v. American Airlines*, 02 Civ. 7179; *Schroeder v. American Airlines*, 02 Civ. 7185; *Baksh v. American Airlines*, 02 Civ. 7224; *Salvo v. United Airlines*, 02 Civ. 7267. Two actions alleging property damage have also been brought. The plaintiffs in *Serko & Simon LLP v. Port Auth. of N.Y. and N.J.*, 02 Civ. 10052, rented space as a law firm in Tower One. The plaintiffs in *Mayore Estates, LLC v. Port Auth. of N.Y. and N.J.*, 02 Civ. 7198, owned 22 Cortlandt Street.

applicable building and fire safety codes, regulations and practices; and 5) instructed Tower Two occupants to return to their offices and remain in the building even while the upper floors of Tower One were being consumed by uncontrolled fires following the airplane crash into Tower One. *See* Plaintiffs' Flight 11 Master Liability Complaint ¶ 85; Plaintiffs' Flight 175 Master Liability Complaint ¶ 82.

The WTC Defendants argue that the complaints against them should be dismissed because they had no duty to anticipate and guard against deliberate and suicidal aircraft crashes into the Towers, and because any alleged negligence on their part was not a proximate cause of the plaintiffs' injuries.[11] The Port Authority argues also that it is entitled to immunity because the complained-of conduct essentially consisted of governmental functions.

Because all these claims arise from crashes into the World Trade Center Towers, New York's choice of law rules apply. *See* Act § 408(b). As discussed earlier, New York has the strongest interest in applying its substantive law to define the issues of duty, proximate causation, and governmental immunity involved in this motion and thus its law will be applied. *See Schultz v. Boy Scouts of Am., Inc.*, 65 N.Y.2d 189, 491 N.Y.S.2d 90, 480 N.E.2d 679, 684–85 (1985).

### ii. *Existence and Scope of Duty*

■ The WTC Defendants contend that they owed no duty to "anticipate and guard against crimes unprecedented in human history." Plaintiffs argue that defendants owed a duty, not to foresee the crimes, but to have designed, constructed, repaired and maintained the World Trade Center structures to withstand the effects and spread of fire, to avoid building collapses caused by fire and, in designing and effectuating fire safety and evacuation procedures, to provide for the escape of more people.

■ The existence of a duty owed by the WTC Defendants to its lessees and business occupants has been clearly set out in New York law. "A landowner has a duty to exercise reasonable care under the circumstances in maintaining its property in a safe condition," *Kush v. City of Buffalo*, 59 N.Y.2d 26, 462 N.Y.S.2d 831, 449 N.E.2d 725, 727 (1983), including the duty to adopt reasonable fire-safety precautions, *see Washington v. Albany Hous. Auth.*, 297 A.D.2d 426, 746 N.Y.S.2d 99, 101 (N.Y.App.Div.2002), regardless of the origin of the fire, *see Whitfield v. City of New York*, 239 A.D.2d 492, 657 N.Y.S.2d 757, 759 (N.Y.App.Div.1997), and *Taieb v. Hilton Hotels Corp.*, 131 A.D.2d 257, 520 N.Y.S.2d 776, 777 (N.Y.App.Div.1987). What constitutes reasonable fire prevention is dictated by the actual property. *Taieb*, 520 N.Y.S.2d at 777. Specific fire hazards caused by the actual building's design or by the materials used in the building must be corrected by the owner in a timely fashion, even when the owner has fully complied with all applicable fire and building codes. *Washington*, 746 N.Y.S.2d at 101.

■ The duty of landowners and lessors to adopt fire-safety precautions applies to fires caused by criminals. "[L]andowners have a duty to protect tenants, patrons or invitees from foreseeable harm caused by the criminal conduct of

---

**11.** One of the cases, *Mayore Estates, LLC v. Port Auth. of N.Y. and N.J.*, 02 Civ. 7198, alleges that after the attacks, debris from the World Trade Center, including asbestos, caused extensive damage to the plaintiffs' nearby building at 22 Cortlandt Street. Because of plaintiff's bankruptcy, briefing was deferred but is now progressing. I will decide the motion to dismiss that case separately.

others while they are on the premises." *Hamilton v. Beretta U.S.A. Corp.*, 96 N.Y.2d 222, 727 N.Y.S.2d 7, 750 N.E.2d 1055, 1061 (2001). *See also Mason v. U.E.S.S. Leasing Corp.*, 96 N.Y.2d 875, 730 N.Y.S.2d 770, 756 N.E.2d 58, 60 (2001). In *Brennan v. New York City Housing Authority*, the Housing Authority was liable for failing properly to respond to a gas leak, which fueled a fire, after a third-party defendant stole a stove from an apartment. 302 A.D.2d 483, 756 N.Y.S.2d 73, 74 (N.Y.App.Div.2003). Likewise, the WTC Defendants owed a duty to the occupants to create and implement adequate fire safety measures, even in the case of a fire caused by criminals such as those who hijacked flights 11 and 175 on September 11, 2001.

 The criteria for establishing the existence of duty, discussed previously in the context of the Aviation Defendants' duty to ground victims, applies as well to the duty of landowners to lessees and business occupants. *See 532 Madison Ave., Gourmet Foods, Inc. v. Finlandia Ctr.*, 96 N.Y.2d 280, 727 N.Y.S.2d 49, 750 N.E.2d 1097, 1101 (2001); *Palka v. Servicemaster Mgmt. Servs. Corp.*, 83 N.Y.2d 579, 611 N.Y.S.2d 817, 634 N.E.2d 189, 193 (1994). First, the parties and society would reasonably expect that the WTC Defendants would have a duty to the occupants of the Twin Towers in designing, constructing, repairing and maintaining the structures, in conforming to appropriate building and fire safety codes, and in creating appropriate evacuation routes and procedures should an emergency occur. Second, although a large number of claims have been filed against the WTC Defendants, there is no danger that the number will proliferate beyond those who died in the collapse of the structures or were injured while trying to escape. Similarly, the WTC Defendants are not subject to unlim-

ited or insurer-like liability, for they can be held liable only after a showing of fault and only to those who suffered death, personal injury, or property damage resulting from their alleged negligence. Furthermore, by specific provision of the Air Transportation Safety and System Stabilization Act, their liability is limited to their insurance coverage. Act § 408(a)(1). Fourth, the defendants' relationship with the plaintiffs, as their landlord or the landlord of their employer, placed the WTC Defendants in the best position to protect against the risk of harm. And fifth, as discussed above, imposing a duty on the WTC Defendants in the situation at hand will not create new channels of liability, for the New York courts have held traditionally that landlords owe duties of safety and care to the occupants of leased premises and their invitees.

 A finding of duty also requires a consideration of the nature of plaintiffs' injuries, and the likelihood of their occurrence from a particular condition. "Defining the nature and scope of the duty and to whom the duty is owed requires consideration of the likelihood of injury to another from a dangerous condition or instrumentality on the property; the severity of potential injuries; the burden on the landowner to avoid the risk; and the foreseeability of a potential plaintiff's presence on the property." *Kush*, 462 N.Y.S.2d 831, 449 N.E.2d at 727. The criteria are clearly satisfied, for the severity and likelihood of potential injuries of people unable to escape from a heavily occupied building before fires envelope evacuation routes is high. The more difficult question is whether the injuries arose from a reasonably foreseeable risk.

 Plaintiffs argue that the WTC Defendants had a duty to exercise reasonable care in order to mitigate the effects of

fires in the Twin Towers.[12] They allege that defendants knew about the fire safety defects in the Twin Towers, as evident by the *Allied* litigation concerning inadequate fireproofing in the construction of the buildings;[13] that defendants could have reasonably foreseen crashes of airplanes into the Towers, given the near miss in 1981 of an Aerolineas Argentinas Boeing 707 and the studies conducted during the Towers' construction reporting that the Towers would be able to withstand an aircraft crash; that defendants were aware of numerous fires and evacuations that had occurred at the World Trade Center since its creation, including arson fires in 1975 and the 1993 terrorist-caused explosion in the garage under Tower One; and that the World Trade Center continued to be a prime target of terrorists. A finding of duty does not require a defendant to have been aware of a specific hazard. *See Sanchez v. State of New York*, 99 N.Y.2d 247, 754 N.Y.S.2d 621, 784 N.E.2d 675, 679–81 (2002). It is enough to have foreseen the risk of serious fires within the buildings and the goal of terrorists to attack the building.

This is a very early point in the litigation. There has been no discovery, and defendants' motions to dismiss accept, as they must, all allegations of the complaints. I hold that the WTC Defendants owed a duty to the plaintiffs, and that plaintiffs should not be foreclosed from being able to prove that defendants failed to exercise reasonable care to provide a safe environment for its occupants and invitees with respect to reasonably foreseeable risks.

### iii. *Proximate and Supervening Causation*

The WTC Defendants argue that even if they are held to have owed a duty to the plaintiffs and even if a jury ultimately finds that they acted negligently, their negligence was not the proximate cause of plaintiffs' damages. This is because, they claim, the terrorist-related aircraft crashes into the Twin Towers were so extraordinary and unforeseeable as to constitute intervening and superceding causes, severing any link of causation to the WTC Defendants.

When an intervening act "is of such an extraordinary nature or so attenuates defendants' negligence from the ultimate injury that responsibility for the injury may not be reasonably attributed to the defendant," proximate cause is lacking. *Kush v. City of Buffalo*, 59 N.Y.2d 26, 462 N.Y.S.2d 831, 449 N.E.2d 725, 729 (1983). Thus, "when such an intervening cause 'interrupts the natural sequence of events, turns aside their course, prevents the natural and probable result of the original act or omission, and produces a different result that could not have been reasonably anticipated,' it will prevent a recovery on account of the act or omission of the original wrongdoer." *Sheehan v. City of New York*, 40 N.Y.2d 496, 387 N.Y.S.2d 92, 354 N.E.2d 832, 835–36 (1976) (citations omitted). The "negligence complained of must have caused the occurrence of the accident from which the injuries flow." *Rivera v. City of New York*, 11 N.Y.2d 856, 227 N.Y.S.2d 676, 182 N.E.2d 284, 285 (1962).

---

**12.** Plaintiffs concede that the WTC Defendants owed no duty to those in the Twin Towers who died upon impact of the planes.

**13.** *Port Authority v. Allied Corp.*, 91 Civ. 0310(CLB) (S.D.N.Y.). In *Allied,* the Port Authority sued the original construction contractors of several buildings owned by the Port Authority, including the World Trade Center, for the use of asbestos.

■ Generally, an intervening intentional or criminal act severs the liability of the original tort-feasor. *Kush,* 462 N.Y.S.2d 831, 449 N.E.2d at 729. But that "doctrine has no application when the intentional or criminal intervention of a third party or parties is reasonably foreseeable." *Id.* In *Bonsignore v. City of New York,* a New York City police officer shot and seriously wounded his wife. 683 F.2d 635 (2d Cir.1982). The wife sued the City, alleging that it was negligent in failing to identify officers who were unfit to carry guns and who would likely use them without proper restraint and in inappropriate circumstances, and in not recognizing that her husband was such an officer. The City defended on the ground of independent and supervening cause, arguing that the officer's intentional and criminal act severed any link of causation to its own alleged negligence. The Court of Appeals held in favor of the wife, ruling that since the officer's act was precisely that which the City should reasonably have foreseen, the police officer's intentional and criminal act was not an independent and supervening break between the City's negligence and the plaintiff's injury. *See id.* at 637–38.

■ At this early stage of the case and in the absence of a factual record, I find that plaintiffs have pleaded sufficient facts to allege legal proximate cause. Plaintiffs allege that the WTC Defendants' negligence was a substantial cause of their injuries, because adequate fireproofing and evacuation would have enabled many more escapes. According to plaintiffs, the terrorist acts did not merely "operate upon" the defendants' negligence, *Derdiarian v. Felix Contracting Corp.,* 51 N.Y.2d 308, 434 N.Y.S.2d 166, 414 N.E.2d 666, 670 (1980); rather, the failure to provide certain safeguards caused the entrapment of many more people and the loss of many more lives. Large-scale fire was precisely the risk against which the WTC Defendants had a duty to guard and which they should have reasonably foreseen. I also decline at this stage to find that the acts of the terrorists qualify as "extraordinary" intervening cause. *Kush,* 462 N.Y.S.2d 831, 449 N.E.2d at 729. While the specific acts of the terrorists were certainly horrific, I cannot find that the WTC Defendants should be excused of all liability as a matter of policy and law on the record before me, especially given the plaintiffs' allegations regarding the defendants' knowledge of the possibility of terrorist acts, large-scale fires, and even airplane crashes at the World Trade Center. The defendants may well be able to show at a later stage in this litigation that the conduct of the terrorists "so attenuates defendants' negligence from the ultimate injury that responsibility for the injury may not be reasonably attributed to the defendant," *Kush,* 462 N.Y.S.2d 831, 449 N.E.2d at 729. Discovery will either supply evidence to substantiate or eviscerate the parties' divergent claims about foreseeability. *See Mason v. U.E.S.S. Leasing Corp.,* 96 N.Y.2d 875, 730 N.Y.S.2d 770, 756 N.E.2d 58, 60 (2001) (discovery necessary to determine foreseeability of an intruder's assault within an apartment complex). At this point, however, both plaintiffs and defendants should be allowed to proceed to discovery on these issues of causation.

### iv. *Governmental Immunity*

■ The Port Authority claims that it is immune from liability to the extent that the plaintiffs complain that the Port Authority was negligent in its performance of governmental functions such as planning for public safety and responding to a public emergency. The Port Authority agrees, however, that it does not enjoy a blanket immunity to suit. *See* N.Y. Unconsol. Laws § 7106 (2003) ("Although

the port authority is engaged in the performance of governmental functions, the said two states [NY and NJ] consent to liability on the part of the port authority in such suits, actions or proceedings for tortious acts committed by it and its agents to the same extent as though it were a private corporation"). The allegations and proofs have to be parsed in order to determine whether, and to what extent, the defense of government immunity applies.

The defense of governmental immunity requires a court to scrutinize specific claims. "It is the specific act or omission out of which the injury is claimed to have arisen and the capacity in which that act or failure to act occurred which governs [governmental] liability, not whether the agency involved is engaged generally in proprietary activity or is in control of the location in which the injury occurred." *Weiner v. Metro. Transp. Auth.*, 55 N.Y.2d 175, 448 N.Y.S.2d 141, 433 N.E.2d 124, 127 (1982). The inquiry is to determine a point "along a continuum of responsibility," one side of which may be considered as proprietary, and the other, governmental. *See Miller v. State*, 62 N.Y.2d 506, 478 N.Y.S.2d 829, 467 N.E.2d 493, 496 (1984). "[The continuum] begins with the simplest matters directly concerning a piece of property for which the entity acting as landlord has a certain duty of care, for example, the repair of steps or the maintenance of doors in an apartment building. The spectrum extends gradually out to more complex measures of safety and security for a greater area and populace, whereupon the actions increasingly, and at a certain point only, involve governmental functions, for example, the maintenance of general police and fire protection." *Id.* When a public entity acts in a proprietary capacity as a landlord, it is held to the same duty as private landlords. *See id.*

*Miller* illustrates the issue. The plaintiff, a student at a SUNY college, was assaulted in the college dormitory by an intruder and sued the State for the university's failure to keep doors locked and maintain adequate security. 478 N.Y.S.2d 829, 467 N.E.2d at 495. The Court of Appeals held that while the state could not be liable for failure to provide police protection, the state in its capacity as landowner had the duty to maintain minimal security measures to protect occupants against foreseeable criminal intrusions. *See id.* at 496.

> As a landowner, the State must act as a reasonable [person] in maintaining his property in a reasonably safe condition in view of all the circumstances, including the likelihood of injury to others, the seriousness of the injury, and the burden of avoiding the risk. Under this standard, a landlord has a duty to maintain minimal security measures, related to a specific building itself, in the face of foreseeable criminal intrusion upon tenants.

*Id.* at 497 (citations omitted).

Plaintiffs allege negligence by the Port Authority in a number of respects: 1) failure to design and construct the World Trade Center buildings according to safe engineering practices and to provide for safe escape routes and adequate sprinkler systems and fireproofing; 2) failure to inspect, discover, and repair unsafe and dangerous conditions, and to maintain fireproofing materials; 3) failure to develop an adequate and safe evacuation plan and emergency management plan; 4) failure to apply, interpret and/or enforce applicable building and fire safety codes, regulations and practices; and 5) instructing Tower Two occupants to remain in the building rather than evacuate. *See* Plaintiffs' Flight 11 Master Liability Complaint ¶ 85; Plaintiffs' Flight 175 Master Liability

Complaint ¶ 82. Based only on the pleadings and before any discovery has occurred, I have been given no basis to determine where, on the continuum between functions that are essentially proprietary and those that are essentially governmental, these various allegations should fall. It would seem, from the pleadings alone, that it would be difficult for the Port Authority to establish its defense with respect to claims of negligent design, construction, inspection, repair, maintenance, and application and enforcement of building codes, for these functions are not likely to differ from those required of private landowners. The same is true regarding allegations relating to inadequate evacuation and emergency management plans and procedures, but these allegations may touch also upon the functions of the Port Authority police force within the Twin Towers, and come closer to the governmental end of the continuum. This may be even more so for the allegation that occupants of Tower Two were told, before the crash into that Tower, to return to, and remain in, their offices, rather than evacuate. The record does not yet show who gave this instruction, whether a member of the Port Authority's security force or some other employee, and for what reasons the instruction was given.

The Port Authority cites to cases which appear to define "governmental function" broadly. See Clinger v. New York City Trans. Auth., 85 N.Y.2d 957, 626 N.Y.S.2d 1008, 650 N.E.2d 855, 856 (1995) (immunity for injuries resulting from storage of construction materials to shield an area of attack for storage was an "overwhelmingly governmental" function); Gasset v. City of New York, 198 A.D.2d 12, 603 N.Y.S.2d 141, 142 (N.Y.App.Div.1993) (immunity to Port Authority for alleged failure to supply adequate security and prevent heavy objects from being thrown from a restricted area, causing death to plaintiff's decedent);

Marilyn S. v. City of New York, 134 A.D.2d 583, 521 N.Y.S.2d 485, 486–87 (N.Y.App.Div.1987) (negligence in distributing keys enabling an intruder to rape a teacher in a restroom implicated governmental security function). But other cases are less expansive. In Crosland v. New York City Transit Authority, for example, the Transit Authority's failure to take reasonable precautions for the safety of passengers, such as failing to summon the police during an attack, was likened to the duty owed to passengers by a common carrier, and immunity was denied. 110 A.D.2d 148, 493 N.Y.S.2d 474, 480 (N.Y.App.Div.1985). The Court ruled:

> This allegation of negligence does not implicate the allocation of police resources or actions taken by the Transit Authority in its police protection capacity, functions which, ordinarily, are governmental. Rather, this allegation touches upon ownership and care relating to transportation of passengers which traditionally has been carried on through private enterprise, specifically by common carriers, and constitutes a proprietary function when performed by a governmental entity.

Id. In Rubino v. City of New York, the Board of Education was held liable for failing to warn or take other actions to address the known risk of items being thrown into the school yard from a neighboring lot. 114 A.D.2d 243, 498 N.Y.S.2d 831 (N.Y.App.Div.1986). The court ruled that the Board of Education, as any landlord, had "a duty to take such steps in the management of its property as were reasonably necessary to prevent injuries to teachers and students from such foreseeable dangers." Id. at 835.

At this point, the Port Authority has not shown that it will prove its defense of governmental immunity as to the negli-

gence allegations made by WTC occupants.

■ The Port Authority argues also that it should have immunity in its capacity as operator of Newark Airport, for alleged negligence in permitting terrorists and weapons aboard United Air Lines flight 93, and for the hijacking and deaths that resulted. The Port Authority claims that it was performing a governmental function.[14] Again, however, the Port Authority has not shown that it was performing a governmental function with respect to the "specific act or omission out of which the injury is claimed to have arisen and the capacity in which that act or failure to act occurred." *Weiner,* 448 N.Y.S.2d 141, 433 N.E.2d at 127. Further development of the record is required.

For the reasons stated, I deny the WTC Defendants' motion to dismiss the complaints.

### C. *Boeing's Motions to Dismiss*

Some of those who were injured and the successors of those who died in the Pentagon, in American Airlines flight 77 which crashed into the Pentagon, and in United Air Lines flight 93 which crashed into the Shanksville, Pennsylvania field, claim the right to recover against Boeing, the manufacturer of the two "757" jets flown by United and American. Plaintiffs allege that Boeing manufactured inadequate and defective cockpit doors, and thus made it possible for the hijackers to invade the cockpits and take over the aircraft. Boeing moves to dismiss the lawsuits.

I hold that plaintiffs have alleged legally sufficient claims for relief under the laws applicable to the claims, Virginia and

Pennsylvania, respectively. I therefore deny the motion except for certain claims, as discussed below.

### i. *Choice of Law*

Section 408(b)(2) of the Act provides that the substantive law "shall be derived from the law, including choice of law principles, of the State in which the crash occurred unless such law is inconsistent with or preempted by Federal law," that is, Virginia as to the claims relating to the crash of American flight 77 into the Pentagon, and Pennsylvania as to the claims relating to the crash of United flight 93 into the Shanksville field.

As discussed in Part II.A.i., Virginia conflicts law chooses the substantive law of the "place of the wrong" (*lex loci delicti*), and thus Virginia law must govern the claims arising from the crash of American Airlines flight 77 into the Pentagon. *McMillan v. McMillan,* 219 Va. 1127, 253 S.E.2d 662, 664 (1979). Pennsylvania's conflicts law chooses the substantive law of the state having the most interest in the outcome of the case. *See Griffith v. United Air Lines, Inc.,* 416 Pa. 1, 203 A.2d 796, 805 (1964). The parties agree that the substantive law of Pennsylvania should govern the claims arising from the crash of United flight 93 in Shanksville.

### ii. *Motion to Dismiss Claims Arising out of the Crash of American Airlines Flight 77*

### a. *Background*

Thus far, three individual complaints have been filed with respect to the flight 77 crash. They charge Boeing with strict tort liability and negligent design based on an unreasonably dangerous design of the

---

**14.** I previously denied a motion brought by all airport operators, including the Port Authority, to dismiss plaintiff's claims. (Order, May 5, 2003.) I did not, however, address the Port Authority's supplemental motion to dismiss based on immunity from liability and thus do so here.

cockpit doors. *See Edwards v. American Airlines, Inc.,* No. 02 Civ. 9234 (brought on behalf of a decedent who was a passenger on flight 77); *Powell v. Argenbright Security, Inc.,* No. 02 Civ. 10160 (brought on behalf of a decedent who died while working at the Pentagon); *Gallop v. Argenbright Security, Inc.,* No. 03 Civ. 1016 (plaintiffs injured at the Pentagon site).

The Plaintiffs' First Amended Flight 77 Master Liability Complaint contains three counts applicable to Boeing. Count Six alleges strict tort liability for an unreasonably dangerous design of the cockpit doors. Count Seven alleges that Boeing breached its duty of care by failing to design the cockpit doors and accompanying locks in a manner that would prevent hijackers and/or passengers from accessing the cockpit. Count Eight alleges that Boeing violated its express or implied warranty that the aircraft structure and frame, with respect to the cockpit doors, were fit for the purposes for which they were designed, intended and used.[15]

### b. *Strict liability claims*

■ Virginia does not permit recovery on a strict liability theory in product liability cases. *See Sensenbrenner v. Rust, Orling & Neale, Architects, Inc.,* 236 Va. 419, 374 S.E.2d 55, 57 n. 4 (1988). Thus, Count Six in the Flight 77 Master Complaint, and the underlying related claims in the individual complaints—Count Three in *Edwards,* Count Five in *Powell,* and Count Five in *Gallop*—are all dismissed.

### c. *Negligent design and breach of warranty claims*

■ Boeing moves to dismiss both the claims of negligent design and breach

of warranty, arguing that it did not owe a duty to prevent the use of the plane as a weapon, and that the independent and supervening acts of the terrorists, not Boeing's acts, caused the injuries of the plaintiffs. A plaintiff, to state a claim of negligence, must allege the existence of a legal duty, violation of that duty, and proximate causation which results in injury. *Marshall v. Winston,* 239 Va. 315, 389 S.E.2d 902, 904 (1990). In order to state a claim of breach of warranty, plaintiff may invoke the Virginia law of an implied warranty of merchantability, which guarantees that a product "was reasonably safe for its intended use when it was placed in the stream of commerce." *Turner v. Manning, Maxwell & Moore, Inc.,* 216 Va. 245, 217 S.E.2d 863, 868–69 (1975).

■ In order to recover under either a negligence or breach of warranty theory against a product manufacturer, "a plaintiff must show (1) that the goods were unreasonably dangerous either for the use to which they would ordinarily be put or for some other reasonably foreseeable purpose, and (2) that the unreasonably dangerous condition existed when the goods left the manufacturer's hands." *Morgen Indus., Inc. v. Vaughan,* 252 Va. 60, 471 S.E.2d 489, 492 (1996). Thus, a manufacturer owes a duty to supply a product "fit for the ordinary purposes for which it is to be used" and safe notwithstanding a reasonably foreseeable misuse that could cause injury, *Jeld–Wen, Inc. v. Gamble,* 256 Va. 144, 501 S.E.2d 393, 396 (1998). However, "a manufacturer is not required to supply an accident-proof product." *Bes-*

---

**15.** In addition, Count Four of the Master Complaint alleges that all defendants are liable to plaintiffs on the theory of res ipsa loquitur. However, since there are no specific allegations in this count against Boeing, and since the individual complaints also do not allege this theory against Boeing, I hold that Boeing is dismissed from this count, with leave to plaintiffs to replead if my assumptions are incorrect.

*ser Co. v. Hansen,* 243 Va. 267, 415 S.E.2d 138, 144 (1992) (citation omitted).

■■■ The existence of duty in the products liability context is a question of law. "[T]he purpose of making the finding of a legal duty as a prerequisite to a finding of negligence, or breach of implied warranty, in products liability is to avoid the extension of liability for every conceivably foreseeable accident, without regard to common sense or good policy." *Jeld–Wen,* 501 S.E.2d at 396 (citations omitted). Legal duty may extend to a user of the product, as well as to its purchaser. *See Morgen Indus.,* 471 S.E.2d at 492.

■■■ While the existence of duty is a question of law, whether a product is unreasonably dangerous is generally a question of fact, *id.,* as is the question whether the misuse was reasonably foreseeable, *Slone v. General Motors Corp.,* 249 Va. 520, 457 S.E.2d 51, 54 (1995). Courts have emphasized that these determinations require careful examination of the record. *Compare Slone,* 457 S.E.2d at 54 (ruling in favor of reasonable foreseeability), *with Jeld–Wen,* 501 S.E.2d at 397 (ruling against reasonable foreseeability). In *Slone v. General Motors Corp.,* the court held that plaintiff could proceed with a claim against a truck manufacturer. 457 S.E.2d at 54. While the plaintiff was dumping a load of gravel using the truck with a dump bed attached, the vehicle flipped backwards, crushing the truck cab and injuring the plaintiff. The court ruled that the plaintiff adequately had alleged both an unreasonably dangerous condition and a reasonably foreseeable misuse, by claiming that the design of the truck cab provided inadequate roof support and that the possibility of rollover was reasonably foreseeable by the truck manufacturer. *See id.* However, in *Jeld–Wen,* 501 S.E.2d at 396–97, the court examined a claim brought when a child, who had gently touched a screen window that had a defective latch, fell through the open window when the screen fell out. The court distinguished the foreseeability of the screen being dislodged by the child's touch and the foreseeability of the child's losing his balance and falling through the open window. The court held that since the screen was not intended to support a child's body weight and prevent the child from falling through the window, the screen manufacturer could not reasonably foresee its misuse in the manner claimed.

■■■ Boeing argues that its design of the cockpit was not unreasonably dangerous in relation to reasonably foreseeable risks, and that the risk of death to passengers and ground victims caused by a terrorist hijacking was not reasonably foreseeable. The record at this point does not support Boeing's argument. There have been many efforts by terrorists to hijack airplanes, and too many have been successful. The practice of terrorists to blow themselves up in order to kill as many people as possible has also been prevalent. Although there have been no incidents before the ones of September 11, 2001 where terrorists combined both an airplane hijacking and a suicidal explosion, I am not able to say that the risk of crashes was not reasonably foreseeable to an airplane manufacturer. Plaintiffs have alleged that it was reasonably foreseeable that a failure to design a secure cockpit could contribute to a breaking and entering into, and a take-over of, a cockpit by hijackers or other unauthorized individuals, substantially increasing the risk of injury and death to people and damage to property. I hold that the allegation is sufficient to establish Boeing's duty.

■■■ Boeing also argues that the regulations of the Federal Aviation Administration ("FAA") relating to design of

passenger airplanes did not require an impenetrable cockpit door, and thus its designs, which satisfied FAA requirements, could not be defective. However, the only support provided by Boeing for its argument is an after-the-fact FAA policy statement, issued to explain why the FAA, in 2002, was requiring airplane manufacturers to provide such doors even though the FAA previously had not done so.

> Flightcrew compartment doors on transport category airplanes have been designed principally to ensure privacy, so pilots could focus their entire attention to their normal and emergency flight duties. The doors have not been designed to provide an impenetrable barrier between the cabin and the flightcrew compartment. Doors have not been required to meet any significant security threat, such as small arms fire or shrapnel, or the exercise of brute force to enter the flightcrew compartment.

67 Fed.Reg. 12,820–12,824 (Mar. 19, 2002).

Boeing has not proffered the parameters that existed when it manufactured its "757" jumbo-jet airplanes that United and American flew on September 11, 2001. Boeing also has not shown the extent to which FAA regulations determined how passenger airplanes were to be constructed. Although a FAA promulgation of standards for the design and manufacture of passenger aircraft may be entitled to weight in deciding whether Boeing was negligent, *see, e.g., Curtin v. Port Auth. of N.Y. and N.J.,* 183 F.Supp.2d 664, 671 (S.D.N.Y.2002) (concluding that the standard of care with respect to aircraft evacuation procedures is a matter of federal, not state, law), statements by the FAA characterizing what its former regulations required does not dictate the totality of the duty owed by aircraft manufacturers. Boeing's argument is not sufficient to sup-

port its motion to dismiss the complaints against it.

### d. *Proximate Causation*

 Boeing next argues that its design of the cockpit doors on its "757" passenger aircraft, even if held to constitute an "unreasonably dangerous condition," was not the proximate cause of plaintiffs' injuries. Boeing argues that the criminal acts of the terrorists in hijacking the airplanes and using the airplanes as weapons of mass destruction constituted an "efficient intervening cause" which broke the "natural and continuous sequence" of events flowing from Boeing's allegedly inadequate design. *See Sugarland Run Homeowners Ass'n v. Halfmann,* 260 Va. 366, 535 S.E.2d 469, 472 (2000) (a "proximate cause of an event is that 'act or omission which, in natural and continuous sequence, unbroken by an efficient intervening cause, produces the event, and without which that event would not have occurred,'" quoting *Beale v. Jones,* 210 Va. 519, 171 S.E.2d 851, 853 (1970)). Plaintiffs have the burden to prove proximate cause and, generally, the issue is a question of fact to be resolved by a jury. *Sugarland,* 535 S.E.2d at 472. However, when reasonable people cannot differ, the issue becomes a question of law for the court. *Id.*

The record at this point does not support Boeing's argument that the invasion and take-over of the cockpit by the terrorists must, as a matter of law, be held to constitute an "efficient intervening act" that breaks the "natural and continuous sequence" flowing from Boeing's allegedly inadequate design. Plaintiffs allege that Boeing should have designed its cockpit door to prevent hijackers from invading the cockpit, that acts of terrorism, including hijackings of airplanes, were reasonably foreseeable, and that the lives of passengers, crew and ground victims would be

imminently in danger from such hijackings. Virginia law does not require Boeing to have foreseen precisely how the injuries suffered on September 11, 2001 would be caused, as long as Boeing could reasonably have foreseen that "some injury" from its negligence "might probably result." *See Blondel v. Hays,* 241 Va. 467, 403 S.E.2d 340, 344 (1991) ("[A] reasonably prudent [person] ought under the circumstances to have foreseen that some injury might probably result from that negligence"). Given the critical nature of the cockpit area, and the inherent danger of crash when a plane is in flight, one cannot say that Boeing could not reasonably have foreseen the risk flowing from an inadequately constructed cockpit door.

Boeing relies heavily on *Baltimore & Ohio Railroad Co. v. Patterson,* 204 Va. 81, 129 S.E.2d 1 (1963), to support its argument that proximate causation was broken by an "efficient intervening cause." The case, however, is distinguishable. The railroad had been using a certain type of switch for more than forty years. While a long freight train was stopped, with eight cars having passed over the switch and the balance of 51 freight cars still on the other side, a six-year old boy living at the side of the track surreptitiously came onto the tracks and threw the switch. When the train resumed its movement, a number of cars derailed, causing property damage to adjoining properties. The Virginia Supreme Court reversed the verdict for the plaintiff, holding that the railroad reasonably could not have foreseen the occurrence. The switch was of a standard type in use for more than forty years; it was used throughout the railroad's extensive system, and at the location in issue; it had consistently been operated in an identical manner for the forty years; the switch had never before been tampered with; and the railroad crew had not been negligent in monitoring the child or the tampered

switch. The court held that an imposition of liability on the railroad would be unreasonable, for it would require the railroad to station employees at or near all its switches. *Id.* at 12–13. The court ruled also that the boy's criminal conduct, not reasonably being foreseen by the railroad, constituted an independent and proximate cause of the adjoining property owner's damage. In contrast, the danger that a plane could crash if unauthorized individuals invaded and took over the cockpit was the very risk that Boeing should reasonably have foreseen. "Privacy" within a cockpit means very little if the door intended to provide security is not designed to keep out potential intruders.

Boeing's citation to cases in other jurisdictions are also distinguishable. Two of the cases, *Port Authority of N.Y. and N.J. v. Arcadian Corp.,* 189 F.3d 305 (3d Cir. 1999), and *Gaines–Tabb v. ICI Explosives USA, Inc.,* 160 F.3d 613 (10th Cir.1998), have already been discussed in Part II. A.iii. of this opinion with respect to the issue of duty. The courts of appeals in both cases addressed the question of causation and held that defendants' actions or inactions were not the "legal proximate cause" of the injuries suffered by the victims of the 1993 World Trade Center and 1995 Oklahoma City bombings. They ruled that the manufacturers of the fertilizer products utilized in the attacks, having made lawful and economically and socially useful fertilizer products, did not have to anticipate that criminals would misappropriate ingredients, mix them with others, and make bombs to bring down a building. The bomb-making by the terrorists were found to be superseding and intervening events and were not natural or probable consequences of any design defect in defendants' products. *See Arcadian Corp.,* 189 F.3d at 318; *Gaines–Tabb,* 160 F.3d at 621.

*In re Korean Air Lines Disaster of September 1, 1983*, No. 83–3442, 1985 WL 9447, 1985 U.S. Dist. LEXIS 17211 (D.D.C.1985), involved lawsuits by the legal successors of passengers who died when Korean Airlines passenger flight 007 was shot down by Russian fighter planes. The passenger plane had flown off course and over a sensitive military zone in Russia. Russian fighter pilots intercepted the plane and, instead of following international protocol for causing the plane to return to international routes over the high seas or to land at a selected landing field, shot it down. Plaintiffs sued Boeing, the manufacturer of the airplane, alleging that a product defect in its navigation systems caused it to fly off course and over Soviet territory, and that Boeing's improper and unsafe design was therefore the proximate cause of plaintiffs' damages. The court dismissed the complaint, holding that Boeing could not foresee that the Soviet Union would destroy an intruding aircraft in violation of international conventions, and had no ability to guard against such conduct. *See id.*, 1985 WL 9447, **5–6, 1985 U.S. Dist. LEXIS 17211, at *17–20. The court held, consequently, that Boeing did not owe a duty to passengers with respect to such risks, and that the actions of the Russian pilots were independent and supervening causes that broke the chain of causation.

These three cases do not offer Boeing much support in its motion. In each, the acts of the third-parties were held to be superseding causes because they were not reasonably foreseeable to the product manufacturer. In *Gaines–Tabb* and *Arcadian*, the courts of appeals held that the fertilizer manufacturers could not reasonably foresee that terrorists would mix their products with other ingredients to create explosives to cause buildings to collapse and occupants to be killed. In *KAL*, the court held that the manufacturer of

airplane navigational systems could not reasonably foresee that a passenger aircraft that strayed off course would be shot down by hostile military forces in violation of international conventions. In the cases before me, however, plaintiffs allege that Boeing could reasonably have foreseen that terrorists would try to invade the cockpits of airplanes, and that easy success on their part, because cockpit doors were not designed to prevent easy opening, would be imminently dangerous to passengers, crew and ground victims. Plaintiffs' allegations that duty and proximate cause existed cannot be dismissed as a matter of law on the basis of the record now before me.

Accordingly, I deny Boeing's motion to dismiss the complaints against it arising from the crash of flight 77 into the Pentagon.

### iii. *Motion to Dismiss Claims Arising out of the Crash of United Air Lines Flight 93*

#### a. *Background*

The successors of the passengers who died in the crash of United Air Lines flight 93 in Shanksville have filed four lawsuits: *Burnett v. Argenbright*, 02 Civ. 6168; *Lyles v. Argenbright*, 02 Civ. 7243; *Cashman v. Argenbright*, 02 Civ. 7608; and *Driscoll v. Argenbright*, 02 Civ. 7912. Their allegations are encapsulated in Plaintiffs' Flight 93 Master Liability Complaint, which mirrors the Plaintiffs' First Amended Flight 77 Master Liability Complaint. The Flight 93 Master Complaint alleges claims against Boeing based on strict tort liability, for an unreasonably dangerous design of the cockpit doors (Count Five); negligence, for failure to design cockpit doors and accompanying locks in a manner that would prevent hijackers and/or passengers from accessing

the cockpit (Count Six); and express or implied warranty, for creating a product that was unfit for the purposes for which it was designed, intended and used (Count Seven).[16]

b. *Strict tort liability and breach of warranty claims*

 Under Pennsylvania law, following section 402A of the Restatement (Second) of Torts, a plaintiff pressing a product liability or strict tort liability claim must allege and prove that the product was defective, that the defect existed when it left the defendant, and that the defect proximately caused the harm. *See Weiner v. American Honda Motor Co. Inc.*, 718 A.2d 305, 307 (Pa.Super.1998). The elements of breach of warranty and strict product liability are the same. *Cucchi v. Rollins Protective Servs. Co.*, 377 Pa.Super. 9, 546 A.2d 1131, 1136 (1998), *rev'd on other grounds*, 524 Pa. 514, 574 A.2d 565 (1990).

 "The question of whether a product is unreasonably dangerous is a question of law. In answering this question a court is essentially making a social policy determination and acting as both a social philosopher and a risk-utility economic analyst." *Riley v. Warren Mfg., Inc.*, 455 Pa.Super. 384, 688 A.2d 221, 224 (1997). Courts must weigh factors such as "the gravity of the danger posed by the challenged design; the likelihood that such danger would occur; the mechanical feasibility of a safer design; and the adverse consequences to the product and to the consumer that would result from a safer design." *Id.* at 225. Manufacturers are held strictly liable for product defects because they "market their product for use and because they have a better opportuni-

ty to control the defect." *Id.* at 228. "The focus is on the nature of the product and the consumer's reasonable expectations with regard to the product." *Id.*

 Within the risk-utility analysis, courts must examine if the product was safe for its intended use. "A product is defective when it is not safe for its intended use ... a manufacturer is entitled to believe that the product will be used in its usual manner, and need not be the insurer for the extraordinary risks an operator might choose to take." *Weiner*, 718 A.2d at 308 (citations omitted). *See also Schindler v. Sofamor, Inc.*, 774 A.2d 765, 772 (Pa.Super.2001). The use must also be by one who is an intended user. *Hittle v. Scripto–Tokai Corp.*, 166 F.Supp.2d 159, 167 (M.D.Pa.2001). *But see Phillips v. Cricket Lighters*, 773 A.2d 802 (Pa.Super.2001), *review granted*, 567 Pa. 763, 790 A.2d 1018 (2001) (rejecting the "intended user" requirement and finding defect when a child started a fire using a butane light, even though the child could not properly be considered an "intended user").

Because the decision of whether the product was unreasonably dangerous and unsafe for its intended use is a question of law, Boeing argues that the judge should not be influenced by conclusory allegations of the complaint. The reason, Boeing argues, is that "the trial court is not bound by any party's legal conclusions as to the intended purpose of a product, even if those conclusions are couched as averments of fact or presented as expert evidence. To hold otherwise would force trial courts (and reviewing courts) to accept unrealistic, generalized or distorted views of the product's purpose simply because

---

**16.** Plaintiffs also allege a general res ipsa loquitur count. However, I dismiss Boeing as a defendant from Count Four because there are no specific allegations against Boeing, and none of the individual complaints alleges this theory against Boeing.

they are presented as factual evidence." *Schindler*, 774 A.2d at 773.

But this is not the situation in the case before me. The cockpit door, like any door, is intended as a separation, a "movable barrier of wood or other material, consisting either of one piece, or of several pieces framed together, usually turning on hinges or sliding in a groove, and serving to close or open a passage into a building, room, etc." Oxford English Dictionary (2d ed.1999). A door may be fitted with, and without, locks, depending on who may be allowed to enter and in what circumstances. The intended users of a door, and in particular a locked door, are those within, in order to assure their privacy, and possibly those without who may have an interest in allowing those within to perform their jobs without unwanted intrusion.

■ Boeing asks me to hold that since the terrorists who hijacked the airplanes were not the intended users of the cockpit doors, one cannot say that the doors were unreasonably dangerous or unsafe in relation to the use that terrorists would be expected to make of the doors. Clearly, however, the intended users of the cockpit doors were not the terrorists who broke through them, but the pilots who had the right to protection from unwanted intrusion, and the passengers who had the right to believe that the pilots could continue to guide the plane, free from intrusion, to ensure their safe arrival at their intended destination. If, as Boeing argues, a person who breaks through a door is considered to be an unintended user, no manufacturer of a door and lock system could ever be liable. The intended user of a door is the person who wishes it to be closed and stay closed, not the person who can easily force it open. The pilots and pas-

sengers are not mere "casual bystanders," but people with a vital stake in the door's performing its intended purpose. *See* Restatement (Second) Torts § 402A, Comments (*l*) and (*o*) (intended users include "those who are passively enjoying the benefit of the product, as in the case of passengers in automobiles or airplanes .... casual bystanders, and others who may come in contact with the product, as in the case of employees of the retailer, or a passer-by injured by an exploding bottle, or a pedestrian hit by an automobile have been denied recovery").[17]

■ Boeing may be able to show that the cockpit doors were not unreasonably dangerous, and that it was not unreasonable to design them to provide privacy without making them impenetrable. At this point, it would be inappropriate for a judge to make this determination. The record will have to be developed to show if the cockpit doors, incapable of keeping out unwanted intruders, were unreasonably dangerous, taking into consideration: 1) the gravity of the danger posed by the design; 2) the likelihood that the danger would occur; 3) the feasibility of a safer design; 4) the adverse consequences to the product and to the consumer that would result from a safer design; 5) the usefulness and desirability of the product; 6) the likelihood that the product will cause injury and the probable seriousness of the injury; 7) the availability of a substitute product which meets the same needs and is not unsafe; 8) the manufacturer's ability to eliminate the unsafe character of the product without impairing usefulness or making the product too expensive; 9) the user's ability to avoid danger by the exercise of care in the use of the product; 10) the user's anticipated awareness of the

---

**17.** There were no reported ground victims of flight 93. I therefore do not have to consider if they would likely fit the criterion of "intended user."

dangers inherent in the product and their avoidability; and 11) the ability of the manufacturer to spread loss through price-setting or insurance coverage. *See Schindler,* 774 A.2d at 772; *Riley,* 688 A.2d at 225.

In order to prevail on their strict liability and breach of warranty claims, the plaintiffs must also show that the defect was the proximate cause for the injuries; this will be discussed in the negligent design analysis below. *Weiner,* 718 A.2d at 307.

### c. Negligent design claims

 Boeing argues that the plaintiffs' negligent design claims must be dismissed because it did not owe a duty of care to the plaintiffs, and because its alleged negligence was not the proximate cause of plaintiffs' damages. The elements of a claim of negligence are: the existence of a duty to plaintiffs; the breach of that duty; a causal relationship between the breach and the resulting injury; and actual loss by the plaintiff. *See Brisbine v. Outside In School,* 2002 PA Super 138, 799 A.2d 89, 93 (2002) (citation omitted). Because Pennsylvania and Virginia law do not appear to differ significantly, the analysis is similar to that for Flight 77.

 Duty is "imposed on all persons not to place others at risk of harm through their actions. The scope of this duty is limited, however, to those risks which are reasonably foreseeable by the actor in the circumstances of the case." *J.E.J. v. Tri–County Big Brothers/Big Sisters, Inc.,* 692 A.2d 582, 584 (1997) (citation omitted). "In the context of duty, the concept of foreseeability means the likelihood of the occurrence of a general type of risk rather than the likelihood of the occurrence of the precise chain of events leading to the injury." *Huddleston v. In-*

*fertility Ctr. of Am., Inc.,* 700 A.2d 453, 460 (Pa.Super.1997) (citation omitted). Plaintiffs have alleged that Boeing reasonably should have foreseen that a negligently designed cockpit door, permitting unauthorized individuals to enter the cockpit, would lead to risk of injury or death. For the same reasons as I have discussed previously, Boeing's motion to dismiss based on the absence of a duty of care to plaintiffs is denied.

 To determine whether proximate cause exists, "the court must determine whether the injury would have been foreseen by an ordinary person as the natural and probable outcome of the act complained of." *Reilly v. Tiergarten Inc.,* 430 Pa.Super. 10, 633 A.2d 208, 210 (1993). The existence of a concurring cause responsible for producing injury does not relieve a defendant of liability, if "a jury could reasonably believe that a defendant's actions were a substantial factor in bringing about the harm." *Powell v. Drumheller,* 539 Pa. 484, 653 A.2d 619, 622 (1995). "Among the factors to consider in determining whether a subsequent force is an intervening or superseding cause are whether the force is operating independently of any situation created by the first actor's negligence and whether it is a normal result of that situation." *Rabutino v. Freedom State Realty Co. Inc.,* 809 A.2d 933, 942 (Pa.Super.2002). Plaintiffs allege that without defendant's negligence, the hijackers would not have been able to intrude into the cockpit and take over the airplane. Again, for the reasons previously discussed, the terrorists' unauthorized entry into the cockpit was not unforeseeable, and did not constitute an "intervening" or "superseding" cause that could, as a matter of law, break the chain of causation.

Accordingly, I deny Boeing's motion to dismiss the complaints against it arising from the crash of flight 93 into Shanksville.

### III. Conclusion

For the reasons stated, the motions to dismiss the complaints by the Aviation Defendants and the WTC Defendants are denied. The motion of Boeing to dismiss Counts Four and Six in the Flight 77 Master Complaint, Count Four in the Flight 93 Master Complaint, Count Three in *Edwards v. American Airlines, Inc.,* No. 02 Civ. 9234, Count Five in *Powell v. Argenbright Security, Inc.,* No. 02 Civ. 10160, and Count Five in *Gallop v. Argenbright Security, Inc.,* No. 03 Civ. 1016, is granted; the remainder of the motion is denied.

By this decision, substantially all preliminary matters have been resolved, with the exception of the Port Authority's motion to dismiss *Mayore Estates LLC,* 02 Civ. 7198(AKH). We are now ready to proceed with the discovery stages of the lawsuits. To this end, I will meet with all counsel for case management purposes on September 26, 2003, at 9:30 a.m., in Courtroom 14D, 500 Pearl Street, New York, N.Y. 10007. Liaison Counsel shall submit a proposed agenda by September 24, 2003.

SO ORDERED.